UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CARLOS GARCIA,

                            Plaintiff,

v.                                                          9:21-CV-0814
                                                            (GTS/ML)
ANDERSON, Correction Officer, Auburn
Correctional Facility; CARSON, Correction
Officer, Auburn Correctional Facility; JOHN
DOE #2; Correction Officer, Auburn
Correctional Facility; and FREDERICK,
Correction Officer, Auburn Correctional Facility,

                            Defendants.
_____

APPEARANCES:                                                OF COUNSEL:

CARLOS GARCIA
  *Pro Se* Plaintiff
Upstate Correctional Facility
Post Office Box 2001
Malone, New York 12953

CAPEZZA HILL, LLP                                           THOMAS CAPEZZA, ESQ.
  Counsel for Defendants Anderson, Carson,                  ABBY McCORMICK-FOLEY,
  and Frederick                                             ESQ.
30 South Pearl Street, Suite P-110
Albany, New York 12207


MIROSLAV LOVRIC, United States Magistrate Judge

## REPORT and RECOMMENDATION

Currently before the Court, in this civil rights action filed by Carlos Garcia ("Plaintiff")

against defendants Anderson, Carson, John Doe #2, and Frederick (collectively "Defendants")

who are—or were at the relevant time—Correction Officers at Auburn Correctional Facility, is a

motion for summary judgment pursuant to Fed. R. Civ. P. 56 filed by Defendants Anderson,

Carson, and Frederick.  (Dkt. No. 87.)  For the reasons set forth below, I recommend that the motion for summary judgment filed by Defendants Anderson, Carson, and Frederick be granted in part and denied in part.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Claims

At this procedural posture, Plaintiff asserts the following three claims: (1) one claim of excessive force against Defendants Anderson, Carson, and Frederick in violation of the Eighth Amendment and 42 U.S.C. § 1983; (2) one claim of failure to intervene against Defendants Anderson, Carson, and Frederick in violation of the Eighth Amendment and 42 U.S.C. § 1983; and (3) one claim of deliberate medical indifference against Defendant John Doe #2 in violation of the Eighth Amendment and 42 U.S.C. § 1983.[1]  (Dkt. Nos. 1, 10.)

---

[1]    Plaintiff filed his complaint on or about July 19, 2021.  (Dkt. No. 1.)  In the more than two years that have passed since then, Plaintiff has not identified Defendant John Doe #2 and has not served process upon him. This failure is not the result of lack of opportunity.  The undersigned has extended the discovery deadline twice.  (Dkt. Nos. 39, 72.)  Plaintiff has had more than two years, far more than the typical 120-day period, to identify and serve Defendant John Doe #2, and the Court is under no obligation to extend the deadline indefinitely.  *See Petway v. City of New York*, 02-CV-2715, 2005 WL 2137805, at *5 (E.D.N.Y. Sept. 2, 2005) (dismissing a claim under Fed. R. Civ. P. Rule 4(m) where the pro se plaintiff failed to serve John Doe defendants within roughly three years of filing complaint); *Thomas v. Keane*, 99-CV-4302, 2001 WL 410095, at *1, *5 (S.D.N.Y. April 23, 2001) (dismissing a claim under Fed. R. Civ. P. Rule 4(m) where the pro se plaintiff failed to serve John Doe defendants within roughly two years of filing complaint); *Cammick v. City of New York*, 96-CV- 4374, 1998 WL 796452, at *1 (S.D.N.Y. Nov. 17, 1998) (dismissing a claim under Fed. R. Civ. P. Rule 4(m) where the plaintiff failed to serve John Doe defendants within two years and five months of filing complaint); *Waldo v. Goord*, 97-CV-1385, 1998 WL 713809, at *5 (N.D.N.Y. Oct. 1, 1998) (Kahn, J.) (dismissing a claim under Fed. R. Civ. P. Rule 4(m) where the pro se plaintiff failed to serve John Doe defendants within a year of filing his complaint).  The undersigned, therefore, recommends *sua sponte* dismissal without prejudice of the claims against Defendant John Doe #2 for lack of timely service.

**B.** **Defendants Anderson, Carson, and Frederick's Statement of Undisputed Material Facts**

Unless otherwise noted, the following facts were asserted and supported by Defendants Anderson, Carson, and Frederick in their Statement of Material Facts and not denied by Plaintiff in a response. (*Compare* Dkt. No. 87, Attach. 6 [Defs. Anderson, Carson, and Frederick's Statement of Material Facts], *with* Dkt. No. 95 [Pl.'s Resp.].)

1.      Plaintiff is an incarcerated individual in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS").[2]

2.      The incidents at issue in this case began on July 25, 2018, at approximately 10:15 p.m., on C Block at Auburn Correctional Facility ("Auburn").

3.      On July 25, 2018, Plaintiff was housed at Auburn on keeplock status in C Block, 12 company, the second floor of the gallery, cell 28. Keeplock is a disciplinary limitation on movement and privileges. Keeplocked individuals are largely confined to their cells, except for showers and daily recreation.[3]

4.      Plaintiff testified during Defendant Carson's arbitration hearing that he was on keeplock status for being out of place when going to commissary.

5.      On July 26, 2018, while Superintendent McCarthy and Deputy Superintendent for Security ("DSS") Corey were making rounds, Plaintiff reported that on the previous night, he

---

[2]      Although Defendants failed to include a citation to the record in support of this asserted fact (Dkt. No. 87, Attach. 6 at ¶ 1), Plaintiff admits the fact (Dkt. No. 95 at ¶ 1), and thus, it does not appear to be in dispute.

[3]      Defendants failed to include a citation to the record in support of the second and third sentences in this asserted fact. (*See* Dkt. No. 87, Attach. 6 at ¶ 3.) However, Plaintiff "agrees" with the fact as asserted and it does not appear to be in dispute. (Dkt. No. 95 at ¶ 3.)

was sprayed with water from a fire extinguisher and that dry chemical from a fire extinguisher was discharged into the back of his cell.

6.     DSS Corey observed white powder in the corner of Plaintiff's cell under the vent and in the vent.  Photos were taken of the vent in the back of Plaintiff's cell and of the area outside the vent, inside the cell where Plaintiff's bed was normally positioned.

7.     Superintendent McCarthy assigned the investigation to the Office of Special Investigations ("OSI") investigator Gudyka on July 27, 2018.

8.     On July 26, 2018, while inspecting the fire extinguishers in the normal course of his duties, Correction Officer Raymond discovered that the seals were missing on a water extinguisher and a dry chemical extinguisher in the housing block.  He further noted that the gauges for each extinguisher were green, indicating that they were still full of water and dry chemical.[4]

9.     Based on his investigation, Investigator Gudyka concluded that the fire extinguishers had been used.

10.     Plaintiff wrote two grievances dated July 25, 2018, titled "Denial of medical attention" and "Staff Misconduct."  DOCCS assigned these grievances the identifier AUB-746698-18.  Plaintiff wrote that after an officer declined to pick up his legal mail, he began

---

[4]     Plaintiff "questions the validity" of Correction Officer Raymond's testimony but fails to cite to any portion of the record to dispute the fact asserted.  As a result, the undersigned deems this fact admitted.  *N.Y. Teamsters v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1[a][3] strictly, reasonably deemed [movant's] statement of material facts to be admitted" because the non-movant submitted a responsive Rule 7.1[a][3] statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations"); *Jamison v. Metz*, 865 F. Supp. 2d 204, 207 n.1 (N.D.N.Y. 2011) (Suddaby, J.) ("[W]herever [the *pro se*] Plaintiff has [willfully] failed to cite record evidence in support of his denials of properly supported facts . . . the Court has deemed such facts admitted to the extent that they are not clearly in dispute."), *rev'd in part on other grounds*, 541 F. App'x 15, 17-19 (2d Cir. 2013).

yelling for the area supervisor.  Plaintiff alleged that three officers then came to his cell, and one

of them carried a fire extinguisher.  Plaintiff alleged that the officer who carried the fire

extinguisher sprayed him, his cell, and his legal mail with water from the extinguisher.  Plaintiff

alleged that "they" then went to the catwalk at the back of his cell, turned off the power to his

cell and sprayed an unidentified white substance through the vent.  Plaintiff claimed to feel

lightheaded and have trouble breathing.  Plaintiff also alleged that he requested—of an officer on

the next shift—medical attention but was told that the nurse would see him in the morning.

Plaintiff alleged that he had "gathered a nice amount of this white substance that officers so

contently sprayed into [his] cell, and [he is] forwarding it to the commissioner of DOCCS, Dept'

[sic] of Health, the Office of O.S.I. and the Governor's Office."

    11.    Plaintiff testified that once the power in his cell was cut, he was in "complete

darkness."  Plaintiff testified that he heard a spraying sound near his air vent and when he went

towards the vent his eyes, nose, and throat started burning so he threw water on to his face.

    12.    Plaintiff testified that after his cell was sprayed with water, he told other inmates

who were located in close vicinity to his cell what happened.  In addition, Plaintiff testified that

he discussed the potential source of the spraying sound that he heard with other inmates.

    13.    Plaintiff wrote letters to the OSI and Superintendent McCarthy dated July 25,

2018.  In his letter to Superintendent McCarthy, Plaintiff stated, "In the event that any attempt is

made to move me out [of] the cell, to clean up the substance that is all in my cell.  It would be

fruitless for I have gathered enough to mail out of the facility, and sent them under other

inmate's name . . ."  Plaintiff's letter to OSI stated that if Plaintiff did not hear or receive a

prompt response then "the substance collected will be sent to the following people under another

name with a complaint attached by myself."  Plaintiff testified that he had no intention of mailing

the powder.  Plaintiff's letter to Superintendent McCarthy stated that Defendant Carson was the only involved officer he recognized.  Plaintiff's letter to OSI did not identify any of the involved officers.

14.    Plaintiff testified that he wrote the grievance and letters to OSI and Superintendent McCarthy with only the aid of a nightlight from a nearby cell.

15.    Plaintiff knew Defendant Carson before July 25, 2018, because Defendant Carson worked with feed up porters to deliver him meals.

16.    At his deposition in October 2022, Plaintiff denied knowing Defendant Anderson by name before the incident on July 25, 2018, and testified that he had not realized that Defendant Anderson had written him a misbehavior report.  Plaintiff testified that some time after the incident on July 25, 2018, he reviewed the misbehavior report and identified Defendant Anderson's name.

17.    Plaintiff first identified Defendant Frederick as the officer who sprayed him with water in a letter to Investigator Gudyka dated July 30, 2018, after other incarcerated individuals "took down his name down and sent it to [Plaintiff]."

18.    Plaintiff testified that Defendant Frederick sprayed him and his legal mail with water.  Plaintiff testified that his legal mail was soaked.  In addition, Plaintiff testified that he changed his shirt and sopped up the water with a towel.

19.    On July 27, 2018, Plaintiff gave a sworn statement to Investigator Gudyka in which, he stated that after he and his legal documents were sprayed with water, he attempted to shield his legal mail from additional water.

20.    Plaintiff swore under penalty of perjury that "I cannot identify the officer that sprayed chemicals through my vent."  Moreover, Plaintiff testified at his deposition, "I can't see

behind my cell, so whoever sprayed behind my cell, I can't say it was him, him, or him, I don't know, because I can't see behind my cell."[5]

21.    Investigator Gudyka showed Plaintiff photographs of officers who had worked on C block on the night of July 25, 2018.  Plaintiff was initially unable to identify anyone, but identified Defendant Carson after Investigator Gudyka told him to look at the photos again. Later, at a follow-up interview with Plaintiff, Investigator Gudyka showed Plaintiff a picture of Defendant Frederick, who Plaintiff identified as the one who sprayed water on him.[6]

22.    Plaintiff testified during his deposition that during that follow-up interview, Investigator Gudyka told Plaintiff that he had just been to Wyoming Correctional Facility and had spoken with an incarcerated individual there that corroborated Plaintiff's assertion that Defendant Frederick was the person who sprayed Plaintiff with water.  Investigator Gudyka testified that he had not visited Wyoming Correctional Facility.

---

[5]    Plaintiff "disagrees as to form" of this asserted fact and attempts to place the fact in context, which is improper.  As a result, the undersigned deems this fact admitted.  *See Maioriello v. New York State Office for People With Developmental Disabilities*, 272 F. Supp. 3d 307, 311 (N.D.N.Y. 2017) (Suddaby, C.J.) ("[T]hroughout Plaintiff's Rule 7.1 Response, she 'admits' many of the facts asserted by Defendants in their Rule 7.1 Statement but then includes additional facts and/or legal argument in those responses. . . . Where this occurs, the Court will deem those facts admitted and disregard the additional factual assertions and/or argument that Plaintiff provides in her responses."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 417 (S.D.N.Y. 2014) (holding that plaintiff's response to defendant's Rule 56.1 Statement failed to comply with the rule because "counsel neither admits nor denies a particular fact, but instead responds with equivocal statements such as: 'Admit, but defendant omits the balance of plaintiff's testimony'"); *Goldstick v. The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make").

[6]    Plaintiff disagrees with this asserted fact by attempting to place it in context, which is improper.  *See*, *supra*, note 5.

23.     Plaintiff collected some of the white powder that was sprayed into his cell through the vent, in an envelope that he put in a plastic bag.  He passed the container containing the white powder to another incarcerated individual the night of July 25, 2018, by handing it down the gallery, from cell to cell.  Plaintiff gave the envelope to Investigator Gudyka on July 27, 2018.

24.     Plaintiff testified that while collecting the powder, he wore a wet towel over his face and to protect him from suffering any ill effects from handling the substance.  The record does not reflect that any other individuals suffered any ill effect from handling the envelope containing the substance.

25.     Plaintiff testified at his deposition that he called out for medical attention after the dry chemical extinguisher was discharged but did not receive it.  Plaintiff testified that he then caused a fire "to create a paper trail."

26.     Plaintiff testified that he wrapped a sheet around a broom, lit the sheet on fire, and set the burning sheet on his cell bars "so the smoke would make the bars black."  Plaintiff testified that when the smoke "filled out to the flats, they came running.  They didn't have no fire extinguishers.  Both of them were empty. . . . so they came with a mop and bucket of water, and they threw it on the sheet.  They picked it up with the broomstick, put it in a bucket, and they went home."

27.     Plaintiff swore under penalty of perjury in his supporting deposition that he set toilet paper on fire and did not mention a sheet.

28.     During his deposition, Plaintiff stated that his supporting deposition did not mention that he set a sheet on fire because "I didn't look into the details at that stage right there. It was two days after the incident.  I am not thinking of every little detail.  I wasn't thinking lawsuit at the time."

29.    Plaintiff testified that he requested medical attention from an officer working the shift from July 25, 2018 at 11 p.m., to July 26, 2018 at 7 a.m., but did not tell the officer that he was suffering from the effects of the dry chemical extinguisher.[7]

30.    In his testimony during Defendant Carson's arbitration hearing, Plaintiff testified that he did tell the officers working on the shift from July 25, 2018 at 11 p.m., to July 26, 2018 at 7 a.m., that his cell had been "sprayed" and he needed medical attention.

31.    Plaintiff testified during Defendant Carson's arbitration hearing that he did not tell officers working on the shift from 7 a.m. to 3 p.m. on July 26, 2018, that he needed medical attention or that he had been sprayed because he slept from 7 a.m. until the Superintendent came to his cell in the afternoon around 2:00 p.m.  During Plaintiff's deposition he denied sleeping from 7 a.m. until around 2:00 p.m. on July 26, 2018, and suggested that the transcript of his testimony in the arbitration hearing had been altered.

32.    Plaintiff was medically examined on July 26, 2018.  The inmate injury report stated, "no injuries noted.  No redness to eyes, nose, or throat noted."  The ambulator health record from July 26, 2018, stated "no injuries noted no treatment required."

33.    In his sworn supporting deposition made on July 26, 2018, Plaintiff stated that he had "seen medical and appear to be alright (sic)."

34.    Plaintiff saw medical again on August 7, 2018.  The ambulatory health record progress note from Plaintiff's visit on August 7, 2018, states that Plaintiff's eyes were flushed for two minutes and he was given natural tears to take to his cell.

---

[7]    Although Plaintiff "disagrees" with the statement as asserted, he fails to cite to any portion of the record to support the dispute.  In addition, a review of the record cited by Defendants Anderson, Carson, and Frederick supports the fact as asserted.  As a result, the undersigned deems this fact admitted.  *See*, *supra*, note 4.

35.     On October 13, 2022, Plaintiff was provided a copy of the transcript from his deposition and the supporting exhibits.  Plaintiff did not make any corrections to the transcript.[8]

36.     By letter dated February 16, 2023, which was received by Plaintiff on February 17, 2023, the arbitration testimony of Plaintiff, Defendant Carson, and Defendant Frederick, and Plaintiff's disciplinary records, were made available for Plaintiff to review.  Plaintiff did not request to review any of those documents.[9]

37.     Defendants Anderson, Frederick, and Carson deny observing anyone spray Plaintiff with a fire extinguisher.[10]

**C.    Parties' Briefing on Defendants Anderson, Carson, and Frederick's Motion for Summary Judgment**

**1.    Defendants Anderson, Carson, and Frederick's Memorandum of Law**

Generally, in support of their motion for summary judgment, Defendants Anderson, Carson, and Frederick assert the following two arguments: (1) the alleged discharge of water and dry chemical extinguishers were at most *de minimis* uses of force and thus cannot support an excessive force claim; and (2) in the alternative, Defendants Carson, Anderson, and Frederick are entitled to qualified immunity.  (*See generally* Dkt. No. 87, Attach. 7.)

More specifically, with respect to their first argument, Defendants Anderson, Carson, and Frederick argue that even assuming that the entire contents of the water fire extinguisher were discharged, it was a relatively minor inconvenience to Plaintiff.  (Dkt. No. 87, Attach. 7 at 8-12.)

---

[8]     Plaintiff "agrees" with the fact as asserted but then attempts to place it in context, which is improper.  *See*, *supra*, note 5.  As a result, the undersigned deems this fact admitted.

[9]     *See*, *supra*, notes 5, 8.

[10]    Plaintiff "emphatically disagrees" with the fact as asserted but failed to cite to any portion of the record to support the dispute.  As a result, the undersigned deems this fact admitted.  *See*, *supra*, note 7.

Moreover, Defendants Anderson, Carson, and Frederick assert that Plaintiff's allegation that the entire water fire extinguisher was discharged is rendered impossible by his testimony of minimal cleanup and Corrections Officer Raymond's testimony that although the seal on the fire extinguisher was missing, it was still full. (*Id*.) Defendants Anderson, Carson, and Frederick argue that the dry chemical extinguisher was not sprayed onto Plaintiff but onto the floor of his cell and thus, no force was used on him at all. (*Id*.) Further, Defendants Anderson, Carson, and Frederick argue that Plaintiff again exaggerates the volume of material discharged from the extinguisher and his assertion that the substance injured him does not raise a material issue of fact. (*Id*.)

With respect to their second argument, Defendants Anderson, Carson, and Frederick argue that even if the Court were to determine that Plaintiff's allegations rise to the level of an Eighth Amendment violation, Defendants are entitled to summary judgment because it has not been clearly established that a single spray of water or the discharge of a dry chemical fire extinguisher onto an incarcerated individual's floor violates the Eighth Amendment. (Dkt. No. 87, Attach. 7 at 12-14.)

### 2.     Plaintiff's Opposition

Generally, in opposition to Defendants Anderson, Carson, and Frederick's motion, Plaintiff argues that the motion should be denied because he has not been afforded a full and fair opportunity to conduct discovery. (*See generally* Dkt. No. 95, Attach. 1.)

Plaintiff then filed an additional memorandum of law in response to the motion for summary judgment. (Dkt. No. 101.) Generally, in the supplemental memorandum of law, Plaintiff asserts the following two arguments: (1) Plaintiff concedes that the use of the water extinguisher was *de minimis* and thus, cannot support his excessive force claim, but disputes

Defendants Anderson, Carson, and Frederick's contention that their use of the dry chemical extinguisher sprayed into his cell through the air vent was insufficiently serious to constitute excessive force; and (2) Defendants Anderson, Carson, and Frederick are not entitled to qualified immunity.  (*See generally* Dkt. No. 101.)

More specifically, with respect to his first argument, Plaintiff argues that the dry chemical extinguisher is a known carcinogen.  (Dkt. No. 101 at 18-20.)  Plaintiff argues that he was left in a contaminated cell for thirteen days and this prolonged exposure to the substance caused his eyes to become infected.  (*Id*.)  Moreover, Plaintiff argues that the law does not require the use of physical force on a person's body to establish an excessive force claim.  (*Id*.)  Further, Plaintiff argues that Defendants Anderson, Carson, and Frederick's comparison of the present matter to a case in which the substance used by the defendants could be wiped off, is illogical and not persuasive because here, Plaintiff could not wipe the air.  Plaintiff argues that the contaminated particles in the air were toxic and can lead to cancer from prolonged exposure. (*Id*.)

With respect to his second argument, Plaintiff argues that Defendant Anderson has an arrest and conviction for a crime similar to the present action that also involved discharging a fire extinguisher.  (Dkt. No. 101 at 20-27.)  Plaintiff argues that Defendant Anderson, therefore, should have been on notice that his actions were violative of the law.  (*Id*.)  Moreover, Plaintiff argues that Defendants Anderson, Carson, and Frederick's conduct was so far beyond the bounds of decency that the unlawfulness was readily apparent, notwithstanding the lack of caselaw.  (*Id*.) Further, Plaintiff argues that the Second Circuit held in *Edrei v. Maguire*, that a police department's use of a long range acoustic device to disperse a crowd of non-violent and non-threatening protesters was an unnecessary and unreasonable use of excessive force.  (Dkt. No.

101 at 21-22 [citing *Edrei v. Maguire*, 892 F.3d 525, 532 (2d Cir. 2018)].)  Finally, Plaintiff

argues that the testimony of Defendants Carson and Frederick during their arbitration hearings

that they were not present and did not witness any spraying of Plaintiff or his cell, is inconsistent

with their current argument that their actions were, at most, *de minimis*.  (Dkt. No. 101 at 20-27.)

### 3.    Defendants Anderson, Carson, and Frederick's Reply

Generally, in further support of their motion for summary judgment, Defendants

Anderson, Carson, and Frederick assert the following two arguments: (1) Plaintiff is not entitled

to stay their motion for summary judgment and re-open discovery because he waived any

objections to the discovery order and his affidavit fails to explain how further discovery would

likely lead to evidence that would raise a triable question of fact; and (2) Plaintiff fails to raise a

triable question of fact in opposition to their prima facie showing of entitlement to summary

judgment in their moving papers.  (*See generally* Dkt. No. 102.)

More specifically, Defendants Anderson, Carson, and Frederick argue that Plaintiff is not

entitled to re-open discovery because (a) Plaintiff failed to timely object to the undersigned's

discovery order of November 15, 2022, (b) Plaintiff failed to diligently pursue any discovery he

believes he is owed, (c) Plaintiff was permitted to review the arbitration transcripts—which are

part of the OSI investigative file he reviewed for seven hours—appended to Defendants' motion,

and (d) Plaintiff fails to identify what he expects to uncover that would raise a triable question of

fact.  (Dkt. No 102 at 4-8.)

Further, Defendants Anderson, Carson, and Frederick argue that Plaintiff fails to raise a

triable question of fact in opposition to their motion for summary judgment because the force

allegedly used was *de minimis*.  (Dkt. No. 102 at 8-13.)  Defendants Anderson, Carson, and

Frederick argue that the alleged use of the dry chemical extinguisher was not force at all because

it was sprayed through a vent onto the floor of Plaintiff's cell and not onto him.  (*Id.*)

Defendants Anderson, Carson, and Frederick argue that the only evidence of the alleged

pervasive fumes from the dry chemical powder is Plaintiff's own testimony, which is too

contradictory and implausible to raise a triable question of fact for trial.  (*Id.*)  Further

Defendants Anderson, Carson, and Frederick argue that Plaintiff's alleged irritation that he

experienced when cleaning up the dry chemical—which he was able to overcome by placing

cloth over his face—is insufficient to raise a triable question of fact whether the use of force was

*de minimis*.  (*Id.*)  Finally, Defendants Anderson, Carson, and Frederick argue that, in any event,

they are entitled to qualified immunity because a reasonable person in their position could not

have known that the acts alleged would violate Plaintiff's constitutional rights.  (*Id.*)

## II. RELEVANT LEGAL STANDARDS GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that

there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as

a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence

is such that a reasonable jury could return a verdict for the [non-movant]."  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986).[11]  As for the materiality requirement, a dispute of fact is

"material" if it "might affect the outcome of the suit under the governing law . . . . Factual

disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the movant.  *Anderson*, 477 U.S. at 255.

---

[11]    As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to
create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation
omitted).  As the Supreme Court has explained, "[The non-movant] must do more than simply

In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*.[12]  (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[13]  As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[14]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material

---

show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

[12]    *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

[13]    *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

[14]    *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 56.1.  What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement[15]–even when the non-movant was proceeding *pro se*.[16]

## III.    ANALYSIS

### A.    Whether Plaintiff Should Be Permitted to Re-Open Discovery

To the extent that Plaintiff's opposition is construed liberally as a request pursuant to Fed. R. Civ. P. 56(d), after carefully considering the matter, I answer this question in the negative for the reasons set forth in Defendants Anderson, Carson, and Frederick's reply memorandum of law.  (Dkt. No. 102 at 4-8.)  The following is intended to supplement, not supplant, those reasons.

Fed. R. Civ. P. 56(d), states that, "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or

---

[15]    Among other things, Local Rule 56.1 (previously Local Rule 7.1(a)(3)) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 56.1.

[16]    *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases); *see also Prestopnik v. Whelan*, 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (Hurd, J.) (holding that the Court is not required to "perform an independent review of the record to find proof of a factual dispute.").

to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).  A party

resisting summary judgment on the basis that it needs discovery must submit an affidavit

showing the following: "(1) what facts are sought [to resist the motion] and how they are to be

obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact,

(3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those

efforts." *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303 (2d Cir. 2003) (internal

quotations and citation omitted).  Relatedly, a discovery schedule set by the court can only be

modified for good cause, which "depends on the diligence of the moving party."  *Parker v.*

*Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000).

Here, the Court ordered that discovery be completed by September 19, 2022, and that

deadline was extended twice—the first time it was extended until November 18, 2022, and the

second time it was extended until February 21, 2023. (Dkt. Nos. 23, 39, 86.)  Plaintiff did not

seek an additional extension of discovery.  (*See generally* Docket Sheet.)  Further, Plaintiff has

not provided any plausible reason to believe that re-opening discovery would allow him to access

to evidence reasonably expected to create a genuine issue of material fact.  Under these

circumstances, Plaintiff has not shown good cause for reopening discovery at this late stage.

Although, the undersigned recognizes that Plaintiff is appearing *pro se*, that does not

excuse his failure to obtain discovery during the appropriate period.  Moreover, as Defendants

Anderson, Carson, and Frederick identify, the testimony from the arbitration hearings was

attached to their motion for summary judgment.  (Dkt. No. 87.)

Accordingly, Plaintiff's request must be denied.  *See Lundstedt v. JP Morgan Chase*

*Bank, N.A.*, 853 F. App'x 704, 708 (2d Cir. 2021) (upholding the district court's decision to not

reopen discovery where the *pro se* plaintiff had "ample time to identify and disclose an expert witness during the discovery period").

### B.    Whether the Alleged Discharge of a Dry Chemical Extinguisher Was, At Most, a *De Minimis* Use of Force[17]

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This includes punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). The Eighth Amendment's prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotations omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).

Although "a *de minimis* use of force will rarely suffice to state a constitutional claim," *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993), the malicious use of force to cause harm constitutes an Eighth Amendment violation per se because in such an instance "contemporary standards of decency are always violated." *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9). The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*,

---

[17]    The parties agree that the discharge of a water extinguisher was, at most, a *de minimis* use of force and thus cannot form the basis of an excessive force claim. (Dkt. No. 87, Attach. 7 at 8-10; Dkt. No. 101 at 4-5.) As a result, to the extent that Plaintiff asserted claims of excessive force and failure to intervene based on Defendants Anderson, Carson, and Frederick's alleged use of the water fire extinguisher, I recommend that those claims be dismissed.

503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)); *see also Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973).

"To determine whether a defendant acted maliciously, several factors should be examined including, 'the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.'" *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (quoting *Romano*, 998 F.2d at 105).

I find that material issues of fact exist with respect to Plaintiff's excessive force claim related to the use of the dry chemical fire extinguisher pursuant to the Eighth Amendment. For example, Defendants Anderson, Carson, and Frederick's alleged decisions to discharge the dry chemical fire extinguisher in Plaintiff's cell as punishment for his demand that his legal mail be picked up, if proven, rises to the level of wantonness necessary to impose liability on them for their actions since discharge of the dry chemical fire extinguisher was not done as part of a good-faith effort to restore discipline. Rather, Defendants Anderson, Carson, and Frederick allegedly sprayed Plaintiff's cell with a fire extinguisher in a malicious and sadistic manner because of their anger with him. *See Beckford v. Portuondo*, 151 F. Supp. 2d 204, 216 (N.D.N.Y. 2001) (Kahn, J.) (denying the defendants' motion for summary judgment on the plaintiff's excessive force claim where the plaintiff asserted that he was sprayed with a fire extinguisher as punishment for his misbehavior and previous altercations with the defendants notwithstanding that the plaintiff did not suffer more than minor injury).

"As this Court has held, when a prison guard applies force against a prisoner that poses no reasonable threat simply because the guard loses his or her temper and wishes to wantonly

inflict pain on the prisoner, a per se violation of the Eighth Amendment occurs." *Beckford*, 151

F. Supp. 2d at 216 (citing *Romaine v. Rawson*, 140 F. Supp. 2d 204, 212-13 (N.D.N.Y. 2001)

(Kahn, J.)).  Further, to the extent that Defendants Anderson, Carson, and Frederick assert that

summary judgment should be granted because Plaintiff did not suffer substantial injury, I reject

that argument because the absence of a serious injury although relevant to the Eighth

Amendment inquiry "does not end it." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).  There is

sufficient evidence in the record to support Plaintiff's assertion that Defendants Anderson,

Carson, and Frederick's use of the dry fire extinguisher in his cell was wanton and resulted in

minor injury to him.  (Dkt. No. 87, Attach. 1 at 45 [Plaintiff's testimony that after hearing "a

poofing sound," his eyes, nose, and throat started burning]; Dkt. No. 87, Attach. 1 at 47 [same];

Dkt. No. 87, Attach. 1 at 48 [Plaintiff's testimony that he felt lightheaded, was dizzy, and his

chest felt "compressed"]; Dkt. No. 87, Attach. 1 at 49 [Plaintiff's testimony that upon smelling

the substance his nose "started burning for real"]; Dkt. No. 87, Attach. 1 at 299 [Plaintiff's

testimony that he could not breathe, felt lightheaded, and his eyes, nose, and throat burned]; Dkt.

No. 87, Attach. 1 at 266 [Plaintiff's medical records indicating his eyes were red and irritated on

August 7, 2018]); *see also Santos v. N.Y.C. Dep't of Corr.*, 08-CV-8790, 2010 WL 1142066, at

*10–11 (S.D.N.Y. Feb. 25, 2010) (finding that a prisoner established the existence of a serious

medical need where he was sprayed with a fire extinguisher, which caused pain in his face and

left eye).

Moreover, I reject Defendants Anderson, Carson, and Frederick's argument that they did

not use any force at all because the fire extinguisher was allegedly sprayed through the vent in

Plaintiff's cell as opposed to directly on Plaintiff.  Courts have held that an excessive force claim

may lie where the plaintiff was not the force's intended object.  *See c.f., Rodriguez v. City of New*

*York*, 14-CV-8647, 2016 WL 11483837, at *4-5 (S.D.N.Y. Aug. 2, 2016) (citing *Santos v.
N.Y.C. Dep't of Corr.*, 08-CV-8790, 2010 WL 1142066, at *5 (S.D.N.Y. Feb. 25, 2010) (denying
the defendants' motion to dismiss where the correctional officer was alleged to have
intentionally sprayed a fire extinguisher at one inmate, missing him but inadvertently injuring the
plaintiff)) (sustaining the plaintiff's excessive force claim based on allegations that he suffered
(1) emotional and mental distress after viewing an assault on another inmate, and (2) an
asthmatic episode that caused him to choke after a chemical agent was used on another inmate).

As a result, I recommend that Defendants Anderson, Carson, and Frederick's motion for
summary judgment arguing that use of the dry chemical extinguisher was *de minimis*, be denied.

### C.    Whether Defendants Anderson, Carson, and Frederick Are Entitled to Qualified Immunity

After carefully considering the matter, the undersigned answers this question in the
negative.

Qualified immunity shields government employees from liability under Section 1983 in
two circumstances: "(1) their conduct did not violate clearly established rights of which a
reasonable person would have known, or (2) it was objectively reasonable to believe that their
acts did not violate these clearly established rights." *Cornejo v. Bell*, 592 F.3d 121, 128 (2d Cir.
2010) (internal quotation marks, alteration, and citations omitted).  "A right is clearly established
when the contours of the right are sufficiently clear that a reasonable official would understand
that what he is doing violates that right." *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011)
(internal quotation marks, alterations, and citation omitted).

Qualified immunity attaches if "officers of reasonable competence could disagree on the
legality of the action at issue in its particular factual context." *Dancy v. McGinley*, 843 F.3d 93,
106 (2d Cir. 2016) (internal quotation marks and citation omitted).  In essence, the doctrine of

qualified immunity provides protection to "all but the plainly incompetent or those who knowingly violate the law." *Dancy*, 843 F.3d at 106 (citation omitted).

"It is indisputable that freedom from the use of excessive force is a clearly established constitutional right." *Atkins v. Cnty. of Orange*, 372 F. Supp. 2d 377, 401 (S.D.N.Y. 2005). "It is equally clear that a reasonable officer would have known that the malicious use of force for no penological purpose is unlawful." *Rodriguez*, 2016 WL 11483837, at *10.

I find that at this juncture, the doctrine of qualified immunity does not bar Plaintiff's Eighth Amendment claim because, as explained above, there are unaddressed issues of fact with respect to events that took place on July 25, 2018. For example, it is unclear whether Defendants Anderson, Carson, and Frederick were involved in the spraying of a dry chemical fire extinguisher in the vent of Plaintiff's cell. (*Compare* Dkt. No. 87, Attach. 3 at ¶¶ 4-5 [Defendant Anderson's affidavit swearing that he did not enter the catwalk behind Plaintiff's cell on July 25, 2018, did not discharge dry chemical from a fire extinguisher into Plaintiff's cell or witness anyone else do so], Dkt. No. 87, Attach. 4 at ¶¶ 4-5 [same with respect to Defendant Carson], and Dkt. No. 87, Attach. 5 at ¶¶ 4-5 [same with respect to Defendant Frederick], *with* Dkt. No. 87, Attach. 1 at 45- [Plaintiff's deposition testimony describing events that occurred on July 25, 2018, including that Defendants Anderson, Carson, and Frederick walked behind his cell in the catwalk, he heard "something like a poofing sound" through his air vent, felt burning to his eyes, nose, and throat, then observed Defendants Anderson, Carson, and Frederick walking off the catwalk and head downstairs].) Moreover, to the extent that Defendants Anderson, Carson, and Frederick argue that, assuming Plaintiff's version of events as true, they are still entitled to qualified immunity because their unconstitutional use of force (spraying of the dry chemical fire extinguisher into the vent of Plaintiff's cell) had an unforeseen consequence (injury to Plaintiff),

I reject that argument. *Rodriguez*, 2016 WL 11483837, at *10 (citing *Robins v. Meacham*, 60 F.3d 1436, 1442 (9th Cir. 1995) ("This situation presents no new principles of which the officers could not have reasonably been aware regarding the constraints which the Eighth Amendment places on the actions of prison officials.")).

As a result, I recommend that Defendants Anderson, Carson, and Frederick's motion for summary judgment based on the doctrine of qualified immunity be denied.

**ACCORDINGLY**, it is respectfully

**RECOMMENDED** that to the extent Plaintiff's response (Dkt. No. 95) is construed as a request pursuant to Fed. R. Civ. P. 56(d), it be **<u>DENIED</u>**; and it is further respectfully

**RECOMMENDED** that Defendants Anderson, Carson, and Frederick's motion for summary judgment (Dkt. No. 87) be **<u>GRANTED</u>** to the extent that it sought dismissal of Plaintiff's excessive force and failure to intervene claims against Defendants Anderson, Carson, and Frederick related to their alleged use of the water fire extinguisher, and **<u>DENIED</u>** to the extent that it sought dismissal of Plaintiff's excessive force and failure to intervene claims against Defendants Anderson, Carson, and Frederick related to their alleged use of the dry chemical fire extinguisher; and it is further respectfully

**RECOMMENDED** that Defendant John Doe #2 be *sua sponte* **DISMISSED** from this action without prejudice, due to Plaintiff's failure to identify and serve that defendant; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Report-Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[18]

---

[18]    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.[19]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated:  November 13, 2023
         Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

---

[19]      If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  FED. R. CIV. P. 6(a)(1)(C).

2010 WL 1142066
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jose SANTOS, Plaintiff,
v.
NEW YORK CITY DEPARTMENT
OF CORRECTION, et al., Defendants.

No. 08 Civ. 8790(GBD)(THK).
|
Feb. 25, 2010.

### REPORT AND RECOMMENDATION

THEODORE H. KATZ, United States Magistrate Judge.

**\*1 TO: HON. GEORGE B. DANIELS, UNITED STATES DISTRICT JUDGE**

**FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE**

Plaintiff Jose Santos ("Plaintiff"), proceeding *pro se,* brings this action pursuant to 42 U.S.C. § 1983, against Defendants the New York City Department of Correction ("DOC"), Correction Officer Brown ("Defendant Brown"), Correction Officer Arias ("Defendant Arias"), and Correction Officer Waiters ("Defendant Waiters") (collectively, "Defendants"), alleging that they violated his rights under the Eighth Amendment of the United States Constitution.

Presently before the Court is Defendants' Motion to Dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted. The motion was referred to this Court for a Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72.1(a) of the Local Civil Rules of the Southern District of New York. For the reasons that follow, the Court recommends that the motion be denied in part, and granted in part.

### BACKGROUND

The following facts, taken from Plaintiff's Amended Complaint, dated November 20, 2008 ("Am.Compl.") unless otherwise noted, are presumed to be true for the purposes of evaluating the instant motion:

The events at issue in this action took place at the Rikers Island prison facility, where Plaintiff was incarcerated during the relevant period. (*See* Am. Compl. ¶ 2.) On April 15, 2008, Plaintiff was standing in line, waiting to receive his dinner tray. (*See id.* ¶¶ 8, 9.) He observed Defendant Brown "playing with another inmate in a sexual manner" in a dorm area that adjoined the area where food was being served. (*See id.* ¶ 9.) Defendant Brown became upset with the other inmate, and told him that she was "going to get him." (*See id.* ¶ 10.) Defendant Brown then picked up a fire extinguisher and chased the other inmate, who ran into the food-service area where Plaintiff was standing. (*See id.* ¶ 11.)

Defendant Brown sprayed the extinguisher at the fleeing inmate, but her aim was apparently inexact: the high-pressure stream of chemicals from the extinguisher hit Plaintiff in the face and left eye. (*See id.* ¶ 12.) When the chemicals hit Plaintiff, he immediately lost sight, and felt "burn[ing]" and "extreme pain" in his eye and on his skin. (*See id.*)

Plaintiff requested that Defendant Brown take him to a hospital or clinic to be treated, and asked to see a captain. (*See id.* ¶ 13.) In response, Defendant Brown allegedly told him that she "did not care if [he] died," and ordered him to "get the fuck away from her." (*See id.* ¶ 14.) Plaintiff then asked Defendant Arias, who had witnessed Brown spraying the fire extinguisher, to send him to the clinic, but Arias told him that he was "just the Meal Relief Officer," and could not do anything to help Plaintiff with his burning eye and skin. (*See id.*) Plaintiff requested the same help from Defendant Waiters, but she too refused, telling Plaintiff that she did not want to get involved because Defendant Brown was the "A–Officer." (*See id.* ¶ 16.)

**\*2** Plaintiff attempted to rinse off the chemicals himself by splashing water on his face and eyes. (*See id.*) After the officers again refused his request to go to the clinic for treatment, Plaintiff placed a call to his family, and told them what had happened. (*See id.* ¶ 17.) They immediately called the prison to inform them that Plaintiff was being denied medical care after being sprayed in the face and eye with chemicals. (*See id.*) An unnamed "female captain," who is not a defendant in this action, then arrived to investigate the

incident, and sent Plaintiff to the clinic approximately two hours later. (*See id.* ¶ 18.)

The medical personnel at the prison's clinic spent four to five hours flushing the chemicals from Plaintiff's face and eye, and then sent him to a doctor for further examination and treatment. (*See id.* ¶¶ 19–20.) The doctor, an eye specialist, took x-rays and gave Plaintiff medication. (*See id.* ¶ 19.) He informed Plaintiff that he was lucky not to have lost an eye, because the chemicals in the fire extinguisher, sprayed at such high pressure, could have caused severe damage. (*See id.* ¶ 20.) The doctor found that the chemicals had caused partial vision loss, and that Plaintiff's left eye was "extremely irritated." (*See id.*)

### DISCUSSION

Plaintiff contends that his Eighth and Fourteenth Amendment rights [1] were violated when Defendant Brown sprayed him with the fire extinguisher, and when Defendants Brown, Arias, and Waiters (the "Individual Defendants") refused to provide him with medical care for the injuries he suffered. He also claims that the Individual Defendants and DOC "fostered an [u]nwritten [p]olicy in which [f]emale [c]orrection [o]fficers are allowed to [p]lay [s]exual [g]ames with [i]nmates," and that this policy led to the injuries he suffered. (*See* Am. Compl. ¶ 22.)

Defendants have moved to dismiss Plaintiff's claims, arguing, among other things, that he has failed to state an Eighth Amendment claim against Defendant Brown for spraying him with the fire extinguisher, because he has not alleged that she maliciously or sadistically intended to harm him (*see* Defendants' Memorandum of Law in Support of Motion to Dismiss, dated May 14, 2009 ("Def.'s Mem."), at 8–10); that he has failed to state an Eighth Amendment claim against any of the Individual Defendants for failure to provide him with medical care because he has not alleged a "serious medical need" to which they were deliberately indifferent (*see id.* at 11–15); that DOC is not a suable entity and therefore not a proper party to this action (*see id.* at 15–16); and that, to the extent Plaintiff's claims are construed to be against the City of New York rather than DOC, they are insufficient because Plaintiff has failed to adequately allege the existence of a city policy or custom responsible for the alleged violation of his constitutional rights (*see id.* at 16–18).

### I. Standard of Review

**\*3** In deciding a motion to dismiss under Rule 12(b)(6), a court "must accept as true all of the factual allegations set out in [the] plaintiff's complaint, draw inferences from those allegations in the light most favorable to [the] plaintiff, and construe the complaint liberally." *Roth v. Jennings,* 489 F.3d 499, 510 (2d Cir.2007) (quoting *Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001)); *see also Weixel v. Bd. of Educ.,* 287 F.3d 138, 145 (2d Cir.2002). "This is especially true when dealing with *pro se* complaints alleging civil rights violations." *Weixel,* 287 F.3d at 146.

Yet, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007) (internal quotation marks and citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868, (2009) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). A claim meets that facial plausibility standard when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949.

"[W]here the facts alleged in the challenged pleading are ambiguous as to whether the conduct alleged is sufficient to warrant a finding of culpability, the determination as to whether a pleading articulates facts sufficient to state a claim upon which relief may be granted [must] include[ ] an assessment as to whether sufficient facts are alleged to make the plaintiff's allegations of wrongdoing 'plausible.' " *Tierney v. Omnicom Group, Inc.,* No. 06 Civ. 14302(LTS) (THK), 2007 WL 2012412, at \*3 (S.D.N.Y. July 11, 2007); *see also Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) ("To survive a motion to dismiss, a complaint must plead enough facts to state a claim to relief that is plausible on its face.") (internal quotation marks and citation omitted).

### II. The Fire Extinguisher Incident

Plaintiff claims that Defendant Brown violated his Eighth Amendment rights when she sprayed the fire extinguisher, hitting him in the face and eye with a high-pressure stream of chemicals, thereby causing him "extreme pain," temporary blindness, and severe eye irritation. Defendants argue that Plaintiff has failed to state the objective element of an Eighth Amendment claim because his injuries were insufficiently serious (*see* Defs.' Mem. at 8), and because spraying the fire extinguisher did not constitute a "use of force" (*see id.*). Defendants further contend that Plaintiff cannot satisfy the subjective element of an Eighth Amendment violation because he alleges that Officer Brown intended to spray the other inmate, and did not "maliciously or sadistically" intend to harm Plaintiff. (*See id.* at 9.)

**\*4** The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners from the "unnecessary and wanton infliction of pain." *Hudson v. McMillian,* 503 U.S. 1, 5, 112 S.Ct. 995, 998, 117 L.Ed.2d 156 (1992). In the prison context, it not only limits prison officials' authority to use force, *see* *Whitley,* 475 U.S. at 327, 106 S.Ct. at 1088, but also imposes an affirmative duty on prison officials to protect prisoners from harm and provide for their basic needs, *see* *Farmer,* 511 U.S. at 834–35, 114 S.Ct. at 1976–77; *Helling,* 509 U.S. at 31–32, 113 S.Ct. at 2480–81; *Estelle v. Gamble,* 429 U.S. 97, 103–04, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976). Thus, Eighth Amendment analysis in the prison context has primarily taken two paths: one as applied to cases alleging that prison officials used excessive force, and the other as applied to cases alleging that prison officials have failed to provide adequate conditions of confinement.

Eighth Amendment claims have both a subjective component, which focuses on whether the defendant's state of mind was sufficiently culpable, that is, whether it was wanton, and an objective component, which considers whether an injury or condition was serious enough to warrant Eighth Amendment protection. *See* *Wilson v. Seiter,* 501 U.S. 294, 298–99, 111 S.Ct. 2321, 2324–25, 115 L.Ed.2d 271 (1991); *see also* *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000. The particular objective and subjective standard to be applied "depends upon the constraints facing the official." *Wilson,* 501 U.S. at 303, 111 S.Ct. at 2326. Courts recognize that prison officials responding to a riot or other emergency must balance the need to maintain prison safety and security against the need

to be restrained in their use of force. Thus, in excessive-force claims, the inquiry focuses on whether the charged official used force in a good-faith attempt to maintain order, or maliciously and sadistically to cause harm. *See* *id.* at 302, 111 S.Ct. at 2326. In conditions-of-confinement cases, no such competing concerns are present. The charged official need only have been "deliberately indifferent" to a significant risk of harm to an inmate's health or safety. *See* *id.* at 303, 111 S.Ct. at 2327.

Defendants construe Plaintiff's claim against Defendant Brown as one alleging excessive force in violation of the Eighth Amendment. However, the claim does not fit easily into the excessive-force framework because, according to the Complaint, (1) Defendant Brown's use of the fire extinguisher had nothing to do with maintaining prison security, and (2) the object of her use of force was another inmate, not Plaintiff. In the Court's view, the factual scenario alleged by Plaintiff is more comfortably analyzed as a claim that Officer Brown created an unconstitutionally dangerous condition of confinement—that she was deliberately indifferent to a serious risk that Plaintiff would be harmed when she gratuitously and indiscriminately sprayed a high-pressure stream of chemicals from the fire extinguisher. *See* *Hope v. Pelzer,* 536 U.S. 730, 738, 122 S.Ct. 2508, 2514, 153 L.Ed.2d 666 (2002) (treating the handcuffing of an inmate to a hitching post, with the handcuffs above shoulder height and cutting into the inmate's wrists, after safety concerns had abated, as a prison condition that constituted deliberate indifference to the prisoner's health and safety); *Farmer,* 511 U.S. at 832–33, 114 S. Ct at 1976–77 (prison officials' duty to provide adequate conditions of confinement includes duty to take "reasonable measures to guarantee the safety of inmates"); *Helling,* 509 U.S. at 35, 113 S.Ct. at 2481 (exposure of inmate to environmental tobacco smoke could state Eighth Amendment claim for a condition of confinement that created a significant risk of harm); *LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998) (knowingly exposing inmate to friable asbestos particles in the air was sufficient to state Eighth Amendment claim of deliberate indifference to inmate health and safety); *see also* *Varella v. Adams,* No. 1CV03624OWWLJOP, 2006 WL 279329, at *3 (E.D.Cal. Feb.6, 2006) (where inmates were alleged to have been knowingly transported in a vehicle in a dangerous manner, and injuries ensued, the allegations were sufficient to state an

Eighth Amendment claim of deliberate indifference to inmate safety).

**\*5** However, Defendants have addressed the claim as an excessive-force claim, and there are a limited number of cases that employ excessive-force analysis when the plaintiff was not the force's intended object. Therefore, the Court will determine whether the Complaint states a claim for relief under the Eighth Amendment, applying both an excessive-force and a conditions-of-confinement analysis.

### A. Dangerous Condition of Confinement

#### 1. Legal Standard

Prison officials have an affirmative duty to provide for prisoners' basic needs, including their "reasonable safety." *See Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979 (safety from attacks by other inmates); *Helling,* 509 U.S. at 32–33, 113 S.Ct. at 2480–81 (safety from dangers posed by secondhand smoke); *Wilson,* 501 U.S. at 303–05, 111 S.Ct. at 2327–28 (safety from dangerous conditions of confinement, including "overcrowding, excessive noise, insufficient locker storage space, inadequate heating and cooling, improper ventilation, unclean and inadequate restrooms, unsanitary dining facilities and food preparation, and housing with mentally and physically ill inmates"). "The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* ... reasonable safety-it transgresses the substantive limits on state action set by the Eighth Amendment." *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 200, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989). Such wanton pain and suffering is "simply not part of the penalty that criminal offenders pay for their offenses against society." *United States v. Walsh,* 194 F.3d 37, 49 (2d Cir.1999) (citing *Boddie v. Schneider,* 105 F.3d 857, 861 (2d Cir.1997)).

To satisfy the objective element of a conditions-of-confinement claim, a plaintiff must allege that the challenged activity or condition posed "a substantial risk of serious harm." *See Hope,* 536 U.S. at 738, 122 S.Ct. at 2514; *Farmer,* 511 U.S. at 833–34, 114 S.Ct. at 1976–77; *Helling,* 509 U.S. at 35, 113 S.Ct. at 2481. Mere

discomfort that does not pose a serious risk to health or safety will not satisfy this standard. *See Trammel v. Keane,* 338 F.3d 155, 165 (2d Cir.2003) (deprivation of mattress, toiletries, and nearly all clothing for approximately two weeks—while perhaps uncomfortable—did not pose serious risk to inmate health and safety).

The subjective analysis focuses on whether the charged official was "deliberately indifferent" to a risk of serious harm to a prisoner's health or safety. *See Hope,* 536 U.S. at 737–38, 122 S.Ct. at 2514–15; *Trammel,* 338 F.3d at 162–63; *Phelps v. Kapnolas,* 308 F.3d 180, 185–86 (2d Cir.2002). Deliberate indifference entails "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result ." *Farmer,* 511 U.S. at 835, 114 S.Ct. at 1978. However, the charged official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Phelps,* 308 F.3d at 186 (quoting *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). Essentially, a defendant must, at a minimum, act with reckless disregard of a serious risk of harm. "[R]ecklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006). However, "[a] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Phelps,* 308 F.3d at 186 (quoting *Farmer,* 511 U.S. at 842, 114 S.Ct. at 1981).

#### 2. Application

**\*6** The risk of harm to Plaintiff's health and safety posed by Defendant Brown's alleged conduct was not so insignificant that, as a matter of law, it could not satisfy the objective prong of an Eighth Amendment violation. As set forth in the Amended Complaint, as a result of Defendant Brown's actions, Plaintiff suffered "extreme pain," partial temporary blindness, and severe eye irritation. (*See* Am. Compl. ¶¶ 12, 16, 20.) His injuries required hours of medical care, as well as medication. (*See id.* ¶¶ 19–20.) The doctor who treated Plaintiff is alleged to have informed him that he had been lucky not to lose the eye completely, due to the corrosive nature of the chemicals and the high pressure at which they were sprayed. (*See id.* ¶ 20.) A dangerous prison

condition that leads to extreme pain, temporary eye damage, and the potential for loss of sight, is sufficiently serious to implicate the Eighth Amendment. *See, e.g., Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003) (a painful facial scar that was source of chronic pain was sufficiently serious to meet the objective element of an Eighth Amendment violation; "We do not ... require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one.");

*Hemmings v. Gorczyk,* 134 F.3d 104, 106–09 (2d Cir.1998) (a torn achilles tendon that caused swelling and pain satisfied objective prong of Eighth Amendment violation); *Williams v. Smith,* No. 02 Civ. 4338(DLC), 2009 WL 2431948, at *8–10 (S.D.N.Y. Aug.10, 2009) (severe back pain satisfied objective prong). Indeed, eye impairments that have been found sufficiently serious to satisfy the objective element of an Eighth Amendment violation for denial of medical care include the deprivation of proper eyeglasses, causing visual impairments such as double vision and the loss of depth perception, *see Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); poor lighting, causing eye strain and fatigue, *see Amaker v. Goord,* No. 98 Civ. 3634(JGK), 1999 WL 511990, at *7 (S.D.N.Y. July 20, 1999); a delay in receiving eyeglasses, causing eye strain and fatigue, *see Myrie v. Calvo,* 591 F.Supp.2d 620, 627 (S.D.N.Y.2008); and an infection causing the loss of vision in the right eye and damage to the left, *see Hines v. Gandham,* No. 9:08 CV 553(GLS)(DLH), 2009 WL 537541, at *7 (N.D.N.Y. Mar. 3, 2009). If these conditions are serious enough to impose an affirmative duty on prison officials to provide sufficient medical care to prevent and treat them, there can be little argument that they are not also serious enough to implicate the Eighth Amendment when prison officials recklessly cause them through their own intentional conduct. Thus, Plaintiff's pain and eye injury are sufficient to satisfy the objective element of his claim. [2]

Plaintiff has also alleged sufficient facts to satisfy the subjective element of his claim. A reasonable fact-finder could conclude that it is obvious that spraying high-pressure chemicals at eye-level, in the presence of a group of people, poses a serious risk of harm, and that Defendant Brown therefore acted with reckless disregard to the safety of Plaintiff and others when she did so. *See Phelps,* 308 F.3d at 186 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979).

**\*7** Therefore, Plaintiff has adequately pled a claim that Defendant Brown violated his Eighth Amendment rights when she was deliberately indifferent to the significant risk that indiscriminately spraying the fire extinguisher would seriously injure Plaintiff. While the facts may ultimately demonstrate otherwise, at this early stage in this proceeding the claim does not merit dismissal.

### B. Use of Excessive Force

#### 1. Legal Standard

In excessive-force cases, the Eighth Amendment inquiry "turns on whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wright v. Goord,* 554 F.3d 255, 269 (2d Cir.2009); *see also Wilson,* 501 U.S. at 302, 111 S.Ct. at 2326; *Blyden,* 186 F.3d at 262. The objective element of an excessive-force claim requires only a showing that the force used was more than *de minimis, see Wright,* 554 F.3d at 269; *Walsh,* 194 F.3d at 48, because when force is used maliciously and sadistically to cause harm, "contemporary standards of decency always are violated ... whether or not significant injury is evident." *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000; *accord Wright,* 554 F.3d at 268–69. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.... Indeed, not even every *malevolent* touch by a prison guard gives rise to a federal cause of action." *Boddie,* 105 F.3d at 862 (internal quotation marks and citations omitted). However, there is no need to demonstrate that a serious injury resulted. "Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000; *see also Wilkins v. Gaddy,* ––– S.Ct. ––––, No. 08–10914, ––– U.S. ––––, at ––– – ––––, 130 S.Ct. 1175, ––– L.Ed.2d ––––, at ––– – ––––, 2010 WL 596513, at *2–3 (Feb. 22, 2010) (per curiam). [3]

The subjective inquiry in excessive-force cases turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Blyden,* 186 F.3d at 262 (quoting *Hudson,* 503 U.S. at 7, 113 S.Ct. at 999). The use of the terms "maliciously and

sadistically" is "not a limit on liability for uses of force that are otherwise in bad faith," but rather "only a characterization of all 'bad faith' uses of force." *Id.* at 263 (citing *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999). Therefore, the subjective inquiry considers whether the charged official used force in service of a legitimate penological objective. "Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind." *Boddie,* 105 F.3d at 861.

### 2. *Application*

It is not possible to conclude, at this early stage, that Defendant Brown's actions involved merely the *de minimis* use of force. As alleged, Brown sprayed a high-pressure stream of chemicals into Plaintiff's face and eye. The combination of the chemicals and the pressure with which they were sprayed was sufficient to cause extreme pain, partial blindness, and may even have risked destroying Plaintiff's eye. That use of force is significant enough to implicate the Constitution. *See Beckford v. Portuondo,* 151 F.Supp.2d 204, 216 (N.D.N.Y.2001) (plaintiff's allegations that he suffered minor injuries when prison guards sprayed him in the face and chest with a fire extinguisher were sufficiently serious to satisfy objective element of Eighth Amendment excessive-force claim); *cf. Wright,* 554 F.3d at 269 ("[W]here a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically, our Court has reversed summary dismissals of Eighth Amendment claims of excessive force even where the plaintiff's evidence of injury was slight and the proof of excessive force was weak."). Therefore, Plaintiff satisfies the objective element of an Eighth Amendment excessive force claim.

**\*8** It is the subjective prong that, at least superficially, poses the greatest obstacle to Plaintiff's excessive-force claim because, even as alleged in the Complaint, Defendant Brown did not maliciously or sadistically spray the extinguisher at *Plaintiff* in order to cause *him* harm. Characterizing the issue in that way, however, does not conclude the inquiry.

The threshold question in the subjective prong of a use-of-force claim is whether force was used in service of a legitimate penological interest. "Infliction of pain that is totally without penological justification is per se malicious." *Ruffino v.*

*Gomez,* No. 3:05 CV 1209(JCH), 2006 WL 3248570, at *6 (D.Conn. Nov.8, 2006) (citing *Hope,* 536 U.S. at 737, 122 S.Ct. at 2514) (internal quotation marks omitted). No legitimate penological purpose can be inferred from Plaintiff's description of Defendant Brown's conduct. When she sprayed the fire extinguisher, there was no fire to be extinguished, and no other apparent security threat. Rather, as alleged, after sexual play, she was angry at an inmate and wanted to punish him. (*See* Am. Compl. ¶¶ 9–11.) *See Boddie,* 105 F.3d at 861 (sexual abuse of inmates serves "no legitimate law enforcement or penological purpose"); *Beckford,* 151 F.Supp.2d at 216 ("when a prison guard applies force against a prisoner that poses no reasonable threat simply because the guard loses his or her temper and wishes to wantonly inflict pain on the prisoner, a per se violation of the Eighth Amendment occurs").

Thus, Plaintiff has satisfied his burden of pleading that Defendant Brown acted in bad faith, because she had no legitimate reason to spray the fire extinguisher at Plaintiff or any other inmate. *See Santiago v. Campisi,* 91 F.Supp.2d 665, 673 (S.D.N.Y.2000) ("plaintiff has satisfied his burden on [the subjective] element by merely pleading a scenario in which the use of force could not have been in good faith.").

Defendants argue that Defendant Brown cannot be liable for an Eighth Amendment violation because she did not intend to use force against *Plaintiff,* and therefore cannot have acted with a sufficiently culpable state of mind. However, the Second Circuit has noted that it is inappropriate to impose a "limit on liability for force that is otherwise in bad faith." *Blyden,* 186 F.3d at 263. While the Second Circuit has not addressed the specific circumstance of one inmate being injured by bad-faith force directed at another, the Ninth Circuit analyzed that exact scenario in *Robins v. Meacham,* 60 F.3d 1436, 1441 (9th Cir.1995), and squarely rejected the argument that Defendants make here.

*Robins* concerned an incident in which prison officials fired a round of bird shot at an inmate who refused an order to "lock up." Several pellets of bird shot went under the cell door of the bystander plaintiff, injuring his foot. He brought an Eighth Amendment suit against the officers, who argued that they could not be held liable for his injuries, because they had intended to use force only against the non-compliant inmate. The Ninth Circuit disagreed, finding that "[t]he standard of wantonness that a plaintiff must establish is not that the

defendants acted *towards him* maliciously and sadistically for the purpose of causing *him* harm," but rather that "the defendants applied force maliciously and sadistically for the very purpose of causing harm-that is *any* harm." *See id.* (emphasis in original).

**\*9** When a corrections official gratuitously uses force that is "not applied in a good-faith effort to maintain or restore discipline," it is by definition wanton and unconstitutional. *Blyden,* 186 F.3d at 263. Defendants fail to explain why such force would cease to be unconstitutional when it injures inmates *in addition to* the official's intended target. Of course, had there been a security justification for Defendant Brown's employing a fire extinguisher against the other inmate, then the use of that force would not have been malicious and wanton, and any consequential injury to Plaintiff could reasonably be viewed as mere negligence. *See Bolden v. O'Leary,* No. 89 C 6230, 1995 WL 340961, at \*5 (N.D.Ill. June 2, 1995) (where correctional officer used a chemical agent on an inmate who was approaching him in a threatening manner, in the midst of other inmates refusing to obey direct orders, the plaintiff-inmate's inadvertent exposure to the chemical agent was not actionable under 🔖Section 1983). That, however, is not what has been alleged in the Complaint.

The Court recognizes that the facts alleged by Plaintiff do not fit comfortably into the elements of an Eighth Amendment excessive-force claim, because it does not appear that Defendant Brown intended to injure Plaintiff. However, when a correctional official intentionally and wantonly uses force without justification against one inmate, and thereby creates a substantial risk of harm and actual injury to other inmates, it cannot be the case that she is free of constitutional liability to the inmates she injures just because they were not her intended targets. Whether Defendant Brown's conduct is viewed as the wanton and bad faith use of excessive force, or as deliberate indifference to inmate health and safety, the allegations of the Complaint are sufficient to state a plausible violation of the Eighth Amendment.

## III. Denial of Medical Care

Plaintiff has alleged that Defendants Brown, Arias, and Waiters were deliberately indifferent to his medical needs when they refused to send him to the prison's clinic immediately after the fire extinguisher incident. Plaintiff claims that Defendant Brown refused his requests for medical care, telling him to "get the fuck away from her" and that she "did not care if [he] died." (*See* Am. Compl. ¶ 14.)

When Plaintiff made the same request of Defendant Arias, he responded that he could not do anything to help, because he was "just the Meal Relief Officer." (*See id.*) Defendant Waiters also refused Plaintiff's request for medical care, telling him that she "was not going to get involved because C.O. Brown was the A–Officer." (*See id.* ¶ 16.)

Defendants contend that Plaintiff's injuries were not serious enough to warrant medical attention, and this claim should therefore be dismissed.

### A. *Legal Standard*

The objective element of an Eighth Amendment claim arising out of the denial of medical care focuses on whether the alleged deprivation of adequate medical care was "sufficiently serious." *See* 🔖⚠ *Salahuddin,* 467 F.3d at 279 (quoting 🔖*Farmer,* 511 U.S. at 834, 114 S.Ct. at 1977). Determining whether the care a prisoner received meets the objective standard requires an additional two-part inquiry. *See id.* First, courts focus on the adequacy of the care. *See id.* Under this part of the analysis, "prison officials who act reasonably in response to an inmate-health risk cannot be found liable under the Cruel and Unusual Punishments Clause." *Id.* at 279–80 (quoting 🔖*Farmer,* 511 U.S. at 845, 114 S.Ct. at 1983). Second, courts focus on the seriousness of a plaintiff's medical needs. *See id.* at 280. "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.' " *Id.* (quoting 🔖*Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)); *see also* 🔖*Brock,* 315 F.3d at 162. The inquiry into the seriousness of a medical condition depends on the deprivation of care that the prisoner has alleged. If the prisoner has alleged that the prison failed to treat his condition at all, then courts will consider the severity of the medical condition itself. However, if the alleged violation is a disruption or delay in treatment, then "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." 🔖*Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003); *see also* 🔖⚠ *Salahuddin,* 467 F.3d at 280.

**\*10**  The subjective element of an Eighth Amendment claim for denial of medical care focuses on whether the defendant acted with "deliberate indifference" to the plaintiff's medical needs. As in conditions-of-confinement cases, the charged official must "act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin,* 467 F.3d at 280 (citing *Farmer* 511 U.S. at 836–37, 114 S.Ct. at 1978); *see also Wilson,* 501 U.S. at 303, 111 S.Ct. at 2327 ("Whether one characterizes the treatment received by the prisoner as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard.") (citations omitted).

### B. *Application*

Plaintiff has adequately pled the objective element of his claim. Turning first to the adequacy of care, Plaintiff has alleged that Defendants did not respond reasonably to his request for medical care. The Eighth Amendment "does not require empathy." *Ramos v. Artuz,* No. 00 Civ. 149(LTS) (HBP), 2003 WL 342347, at \*9 (S.D.N.Y. Feb. 14, 2003); *see also Verley v. Goord,* No. 02 Civ. 1182(PKC)(DCF), 2004 WL 526740, at \*13 (S.D.N.Y. Jan. 23, 2004) (Report and Recommendation). Nor does the mere fact that an official was hostile or verbally abusive to an inmate seeking care give rise to an Eighth Amendment claim. *See Verley,* 2004 WL 526790 at \*13;*Verley,* 2004 WL 526790 at \*13; *Johnson v. Bendheim,* No. 00 Civ. 720(JSR)(KNF), 2001 WL 799569, at \*6 (S.D.N.Y. July 13, 2001). What is required, however, is that prison officials provide reasonable care. *See Salahuddin,* 467 F.3d at 279–80. Here, Plaintiff contends that Defendants refused to provide him with *any* medical care, and, as alleged, they did not make that decision on the basis of their reasonable judgment about Plaintiff's medical needs.

As to the seriousness of Plaintiff's medical condition, he alleges that he was deprived of care for a period of "several hours, until, at the behest of his family, a captain eventually arrived and referred him to the prison's medical clinic. (*See* Am. Compl. ¶ 18.) Plaintiff does not claim that the treatment he received from the medical staff at the clinic was inadequate. (*See* Am. Compl. ¶¶ 18–20.) Therefore, the deprivation at issue is the delay in treatment, and it is the seriousness of the risk posed by that delay that is relevant to Plaintiff's Eighth Amendment claim. *See Smith,* 316 F.3d at 186.

At this early stage, drawing all inferences in the Amended Complaint in Plaintiff's favor, the Court cannot conclude that the delay in Plaintiff's medical care was not serious. Considering the three relevant criteria—(1) whether a reasonable doctor or patient would find the condition important and worthy of comment, (2) whether the condition "significantly affects an individual's daily activities," and (3) whether it causes "chronic and substantial pain"— Plaintiff's allegations clearly satisfy (1) and (3), and plausibly fulfill (2). *See Salahuddin,* 467 F.3d at 279–80. The Amended Complaint alleges that Plaintiff was in "extreme pain," and the prison's medical staff clearly thought that his condition was worthy of attention, as evidenced by the x-ray diagnostics, medication, referral to an eye specialist, and hours of medical care they provided once he was eventually brought to the clinic. Plaintiff also alleges the sort of condition that might plausibly "significantly affect" his daily activities: the temporary loss of sight in his left eye.

**\*11**  Defendants argue that Plaintiff was not actually in severe pain, and that his eye was merely "red and irritated," but those sorts of factual disputes are not appropriately considered on a motion to dismiss,[4] where the Court must "take as true all of the allegations contained in plaintiff['s] complaint and draw all inferences in favor of the plaintiff [ ]." *Weixel,* 287 F.3d at 145. Therefore, Plaintiff has adequately pleaded the objective element of his Eighth Amendment claim.

Plaintiff also has adequately pled the subjective element of his claim. He has alleged that the Individual Defendants were aware that he had been sprayed in the face and eye with chemicals from the fire extinguisher, and that he was in pain. (*See* Am. Compl. ¶¶ 12–16.) Moreover, he made a direct request to each of them for medical attention. (*See id.*) Taken together, those allegations are sufficient to state a plausible claim that the Individual Defendants were deliberately indifferent to a substantial risk that Plaintiff would suffer serious harm. Therefore, Plaintiff has adequately pled a denial of medical care that violates the Eighth Amendment.

### IV. Claims Against DOC

It is well established that New York City agencies, such as the Department of Correction, are not suable entities. *See* N.Y. City Charter Ch. 17 § 396 ("[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of agency, except where otherwise provided by law"); *see also Marcello v. Dep't of Corr.,* No. 07 Civ. 9665(NRB), 2008 WL 2951917, at *4 (S.D.N.Y. July 30, 2008) (under the New York City Charter, agencies of the City are immune from suit); *Green v. City of N.Y. Dep't of Corr.,* No. 06 Civ. 4978(LTS)(KNF), 2008 WL 2485402, at *4 (S.D.N.Y. June 19, 2008) (dismissing the New York City Department of Correction as a defendant because it is a non-suable entity); *Echevarria v. Dep't of Corr. Servs. of N.Y. City,* 48 F.Supp.2d 388, 391 (S.D.N.Y.1999) (holding that the New York City Department of Correction is not a suable entity). [5] Therefore, I recommend that the claims against DOC be dismissed.

### CONCLUSION

For the foregoing reasons, the Court recommends that Defendants' motion to dismiss be denied with respect to the claims against the Individual Defendants, and granted as to the claims against DOC.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a) and (d). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable George B. Daniels, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Daniels. Failure to file objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 1142066

### Footnotes

1    Because Plaintiff was a sentenced inmate in post-conviction detention during the relevant period, his claims are properly analyzed under the Eighth Amendment. *See Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994); *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993); *Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986).

2    Defendants argue that Plaintiff's medical records indicate that he sustained only eye irritation, redness, and conjunctivitis as a result of the incident, and, therefore, he cannot satisfy the objective prong of an Eighth Amendment claim. (*See* Defs.' Mem. at 8.) The Court need not determine whether such consequences would be serious enough to give rise to an Eighth Amendment violation because the evidence in Plaintiff's medical records is not relevant to a Rule 12(b)(6) motion to dismiss. Here, the Court must accept the allegations of the Complaint as true, and matters outside of the pleadings cannot be considered. This will not be the case if a motion for summary judgment is brought after the parties have an opportunity for pretrial discovery.

3    Nevertheless, the absence of serious injury is relevant to the inquiry into whether the force used was *de minimis,* even though it does not end it. *See Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (citing

⚑ *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999); *see also* ⚑ *Wilkins,* ——U.S. ——, at —— – ——, 130 S.Ct. 1175, —— L.Ed.2d ——, at —— – ——, 2010 WL 596513, at *2–3.

4    Defendants have cited several cases in support of their argument that Plaintiff's medical needs were not serious, but all were decided at the summary judgment stage, on the basis of pretrial discovery, which is not appropriate at the motion to dismiss stage. *See* ⚑ *Edmonds v. Greiner,* No. 99 Civ. 1681(KNF), 2002 WL 368446, at *12 (S.D.N.Y. Mar.7, 2002) (granting summary judgment to defendants on plaintiff's claim that he was denied medical care overnight after prison guard threw substance in his eyes, and finding that prison guard acted reasonably, relying on evidence that guard had contacted medical staff and informed them of the problem with plaintiff's eyes and been told to have plaintiff flush his own eyes with water and come for an examination the following morning); ⚑ *Pressley v. Green,* No. 02 Civ. 5261(NRB), 2004 WL 2978279, at *4 (S.D.N.Y. Dec.21, 2004) (granting summary judgment, relying on medical records and doctor's affidavit to determine that a delay of several hours in treating plaintiff's first and second degree burns was not serious, and that there was insufficient evidence that plaintiff had been in severe pain); ⚑ *Smart v. City of New York,* No. 08 Civ. 2203(HB), 2009 WL 862281, at *7 (S.D.N.Y. Apr.1, 2009) (granting summary judgment, relying on deposition testimony to find that plaintiff, who had been sprayed in the eyes with pepper spray, did not have a serious medical need, because plaintiff's eyes were flushed by a nurse after he had seen a doctor, and doctor would have flushed the eyes himself if condition had been urgent).

5    Plaintiff claims that the fire extinguisher incident was the result of "an unwritten policy in which female correction officers are allowed to play sexual games with inmates." (*See* Am. Compl. ¶ 22.) However, he alleges only a single incident involving a single officer, and does not plausibly allege that the "policy" he references was the proximate cause of his injury. While municipal governments can be liable under ⚑ § 1983 for constitutional violations that are the result of a governmental custom or policy, whether written or unwritten, *see* ⚑ *Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978), Plaintiff's claim is implausible on its face. It would therefore be inappropriate to allow Plaintiff to amend his Complaint to add the City of New York as a Defendant in place of DOC.

---

**End of Document**                                 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Rodriguez v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 11483837
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Tyler RODRIGUEZ, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.

14cv8647-PGG-FM
|
Signed 08/02/2016

**Attorneys and Law Firms**

Tyler Rodriguez, Bronx, NY, pro se.

Erica Michelle Haber, Richard Bahrenburg, Joseph Rizza, New York City Law Department, New York, NY, for Defendants.

## REPORT AND RECOMMENDATION TO THE HONORABLE PAUL G. GARDEPHE

FRANK MAAS, United States Magistrate Judge.

**\*1** In this pro se civil rights action pursuant to 42 U.S.C. § 1983 ("Section 1983"), plaintiff Tyler Rodriguez ("Rodriguez") alleges that his constitutional rights were violated while he was an inmate at the Manhattan Detention Complex ("MDC") operated by the New York City Department of Correction. (ECF No. 17 ("Amended Complaint" or "Am. Compl.") ). The defendants named in the Amended Complaint are the City of New York ("City"); Antonio Cuin, Warden of the MDC ("Warden Cuin"); Captains Almodovar, Myke, and Williams; and Correction Officers ("C.O.'s") Allen and Williams (collectively, the "Defendants"). Rodriguez principally alleges that, in violation of his constitutional rights, he was threatened by MDC officers and transferred to another facility because he witnessed an assault on another inmate.

The Defendants have moved to dismiss Rodriguez's Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF No. 26). For the reasons set forth below, that motion should be granted in part, and denied in part.

I. Factual Background

The following facts are derived from Rodriguez's pleadings, [1] presented in the light most favorable to him, and assumed to be true for present purposes.

Rodriguez arrived at the MDC on August 12, 2014, as a sentenced inmate assigned to a work detail. [2] (See Compl. at 23). On the afternoon of September 10, 2014, he was part of the third floor sanitation team. (Id. at 5). While filling a mop bucket in a closet, he heard a group of five MDC officers [3] and an inmate yelling outside the door. (Id.). He attempted to leave the closet, but C.O. Handly told him to "get back in there." (Id.). Rodriguez complied, but continued to observe the officers through an opening in the closet door. (Id.). He heard Captain Myke [4] yell, "take the handcuffs off this wanna be gangster he wanna be a t[ough] guy." (Id.). Over the inmate's protests, Captain Almodovar removed the handcuffs and said, "you uncuffed now pop off." (Id.). C.O. Williams then punched the inmate in the face, knocking him to the floor. (Id. at 6).

**\*2** Subsequently, although he could no longer see what was happening, Rodriguez heard a continued beating while the inmate yelled, "stop stop please please," and then, "I[']m g[o]nn[a] sue you mother fuckers this is how you serve y[our] country this is how you do." (Id.). Rodriguez also heard Captain Myke say, "spray him like a roach," after which someone "sprayed" the inmate (presumably with pepper spray). (Id.). Hearing the inmate crying and choking, Rodriguez "step[ped] back in shock," with his heart "beating fast." (Id. at 6-7). Rodriguez started to cough, took out his asthma inhaler, and was able to use it three times before he "started to choke on [his] spit." (Id. at 7). Rodriguez took off his shirt, wet it, and put it around his mouth in an attempt to counteract the effects of the spray. (Id.). He then banged on the closet door and pushed it open, whereupon one of the officers instructed him to return to the cell block. (Id.).

On September 11, the day after this assault, Rodriguez was assigned to deliver sandwiches to inmates. (Id. at 9). After watching Rodriguez for some time, C.O. Allen said to him, "I've been doing this shit for years an[d] I already know about you so if you do[n't] want to take the next bus to Rikers an[d have] good time taken away I su[gg]est you keep it mov[ ]ing before I write y[our] ass up." (Id.). That same afternoon, when Rodriguez was back on third floor sanitation duty, Captain Almodovar "pulled [him] out [of] the closet with a mean voice saying what is this I hear you talking ... about what

happen[ed] yesterday.... If I was you I would shut the fuck up an[d] keep y[our] mouth shut about what happen[ed] cause the same shit can happen to you." (Id. at 11). After C.O. Williams asked Captain Almodovar to leave Rodriguez alone, Rodriguez "walked away scared" and spoke to his supervisor before eventually leaving work. (Id. at 11-12).

One day later, on September 12, Captain Williams [5] informed Rodriguez that someone had contacted the MDC to report that Rodriguez was "hav[ ]ing a problem with a correctional officer," and asked if Rodriguez wanted to see a psychiatrist. (Id. at 13). Rodriguez told Captain Williams that he had been verbally threatened because of what he had witnessed on September 10, but the Captain's only response was that the officers would lie about what happened to "cover their asses for the safety of their job." (Id. at 13-14). Captain Williams asked Rodriguez to write a statement, but Rodriguez refused. (Id. at 14-15). Rodriguez did speak to a psychiatrist, however. (Id. at 15).

Subsequently, Rodriguez filed a grievance regarding the foregoing incidents and then was transferred from the MDC to Rikers Island. (See id. at 24). His attempts to appeal that transfer were unsuccessful. (Id.). Although Rodriguez does not provide dates for these events, both obviously occurred by September 25, 2014, when he gave the Complaint to prison officials for mailing. (See id. at 27).

## II. Procedural Background

Rodriguez's Complaint is dated September 25, and was received by the Pro Se Office on October 28, 2014. (Id. at 1, 27). After the City identified three of the John Doe defendants, (see ECF No. 13), Your Honor directed that Rodriguez file an Amended Complaint naming them, (see ECF No. 15), which he did on April 2, 2015, (Am. Compl.). In both of his pleadings, Rodriguez complains that he was subject to "[c]ruel and inhumane treatment, loss of work assignment, transfer of [f]acility[,] and [e]motional distress and [m]ental anguish and duress." (Compl. at 4; Am. Compl. at 13). Rodriguez asks to be "transferred back" to the MDC, and to be "reinstated to [his] work assignment with back pay." (Compl. at 25; Am. Compl. at 15). He also seeks $45,000 in emotional distress damages. (Id.). His request for mandatory injunctive relief is moot since he was released from custody after this suit was filed. (See ECF No. 9).

**\*3** On October 9, 2015, the Defendants filed their motion to dismiss the Amended Complaint, which was referred to

me on November 30, 2015. (ECF Nos. 26, 32). Although the Defendants' motion papers were sent to Rodriguez's last known address, he has never responded, despite the passage of more than nine months.

## III. Standard of Review

A Rule 12(b)(6) motion to dismiss for failure to state a claim "tests the legal sufficiency of [a] plaintiff's claim[s] for relief." 🔖 Krasner v. HSH Nordbank AG, 680 F. Supp. 2d 502, 511 (S.D.N.Y. 2010). In deciding such a motion, the Court must accept as true all factual allegations made in the complaint and draw all reasonable inferences in favor of the plaintiff. 🔖 Allaire Corp. v. Okumus, 433 F.3d 248, 249-50 (2d Cir. 2006) (citation omitted). A complaint need not contain "detailed factual allegations." 🔖 Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting 🔖 Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ). Nonetheless, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing 🔖 Twombly, 550 U.S. at 555).

To survive a Rule 12(b)(6) motion, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Id. (quoting 🔖 Twombly, 550 U.S. at 570). Determining whether the allegations of a complaint nudge a plaintiff's claims across the line from merely "conceivable to plausible" requires the Court to "draw on its judicial experience and common sense." 🔖 Id. at 679-80 (citations omitted). In making its assessment, the Court may consider, in addition to a plaintiff's factual averments, any written instrument upon which the plaintiff necessarily relies, regardless of whether it is attached to the complaint or incorporated therein by reference. 🔖 Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002). Legal conclusions masquerading as factual averments, however, may not be taken into account. 🔖 Twombly, 550 U.S. at 555.

The Court must read pro se pleadings "liberally" and interpret them "to raise the strongest arguments" that they may suggest. 🔖 Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010) (quoting Harris v. City of N.Y., 607 F.3d 18, 24 (2d Cir. 2010) ). "Dismissal of a pro se complaint is nevertheless appropriate where a plaintiff has clearly failed to meet minimum pleading

Case 9:21-cv-00814-GTS-ML   Document 110   Filed 11/13/23   Page 37 of 73

Rodriguez v. City of New York, Not Reported in Fed. Supp. (2016)

requirements." Carvel v. Ross, No. 09 Civ. 722 (LAK) (JCF), 2011 WL 856283, at *8 (S.D.N.Y. Feb. 16, 2011).

IV. Discussion

"To state a claim under [ Section] 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988); accord McKithen v. Brown, 481 F.3d 89, 99 (2d Cir. 2007). In addition, "[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [ Section] 1983." Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010) (quoting Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) ).

In this case, construing his pleadings liberally, Rodriguez appears to contend that the Defendants violated his rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution, as well as New York state law. (See generally Compl.; Am. Compl.). I will address each of these potential claims in turn.

A. Eighth Amendment Excessive Force [6]

**\*4** The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. To state an Eighth Amendment claim arising out of the excessive use of force, a prisoner must allege facts satisfying both a subjective and an objective standard. Hudson v. McMillian, 503 U.S. 1, 8-9 (1992). The subjective standard requires that the force be used "maliciously and sadistically to cause harm," rather than "in a good-faith effort to maintain or restore discipline." Id. at 7. To meet the objective standard, a prisoner must show that "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." Id. at 8 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991) ). This requirement may be satisfied even if the victim does not sustain physical injury, as long as the force used is either more than de minimis or "repugnant to the conscience of mankind." Id. at 9-10 (quoting Whitley v. Albers, 475 U.S. 312, 327 (1986) ); see also Estelle v. Gamble, 429 U.S. 97, 106 (1976). In the excessive force

context, the Second Circuit has held that any malicious use of force to cause harm is, by definition, repugnant to the conscience of mankind – effectively "constitut[ing] an Eighth Amendment violation per se." United States v. Walsh, 194 F.3d 37, 50 (2d Cir. 1999) (quoting Blyden v. Mancusi, 186 F.3d 252, 263 (2d Cir. 1989) ); see also D'Attore v. N.Y.C. Dep't of Corr., No. 10 Civ. 815 (JSR) (MHD), 2012 WL 4493977, at *13-15 (S.D.N.Y. Sept. 27, 2012) (applying Walsh).

This case differs from the usual excessive force claim since there clearly was no intent to harm Rodriguez in any way during the September 10 assault. Nevertheless, "there are a limited number of cases that employ excessive-force analysis when the plaintiff was not the force's intended object." Santos v. N.Y.C. Dep't of Corr., No. 08 Civ. 8790 (GBD) (THK), 2010 WL 1142066, at *5 (S.D.N.Y. Feb. 25, 2010), report and rec. adopted, 2010 WL 1142065 (S.D.N.Y. Mar. 25, 2010). In Santos, for example, the defendants' motion to dismiss was denied where the correctional officer was alleged to have intentionally sprayed a fire extinguisher at one inmate, missing him but inadvertently injuring the plaintiff. Id. at *7-9.

In arriving at the determination that this stated a claim, Magistrate Judge Katz relied on the Ninth Circuit's decision in Robins v. Meacham, 60 F.3d 1436 (9th Cir. 1995). There, a prison guard fired a round of birdshot at an inmate, resulting in injury to the plaintiff's foot when some of the shot came under his cell door. The court held that the trial judge had properly denied summary judgment because there was a material factual issue as to whether the guard acted to quell a disturbance or simply because the inmate intended as the target was not locking up quickly enough. Id. at 1441. As the court explained, in the latter case, the guard's malicious and sadistic conduct could give rise to an Eighth Amendment claim because the Supreme Court never has indicated that an excessive force claim requires "a specific intent to harm or punish a specific individual." Id. at 1440 (emphasis in original).

More recently, in Bilan v. Davis, No. 13 Civ. 5509 (RJS) (JLC), 2013 WL 3940532 (S.D.N.Y. July 31, 2013), Magistrate Judge Cott relied on both Santos and Robins in the course of concluding that an inmate "could potentially state a claim for excessive force if he was injured while officers were trying to use excessive force against the non-party inmate."

Case 9:21-cv-00814-GTS-ML   Document 110   Filed 11/13/23   Page 38 of 73

Rodriguez v. City of New York, Not Reported in Fed. Supp. (2016)

Id. at *7. As these cases establish, if Rodriguez is able to make a plausible showing that MDC officers used excessive force against another inmate, but injured him in the process, he may be able to recover damages on that theory.

Here, Rodriguez alleges that five MDC officers – four of whom are named as defendants in this action – removed another inmate's handcuffs over the inmate's protests, and asked him to "be a t[ough] guy" and "pop off," ostensibly by attacking the officers. When the inmate refused to do so, the officers nonetheless punched him in the face, beat him repeatedly, and sprayed him with a chemical agent. All the while, at least one of the officers knew that Rodriguez was in the closet where he likely could hear, if not see, what was happening. (See Compl. at 5-7). Although Rodriguez complains primarily about the emotional and mental distress that viewing the assault caused him, (see id. at 4, 21-22, 25; Am. Compl. at 13, 15), he also alleges that his inhalation of the chemical agent used on the other inmate caused him to choke and have an asthmatic episode, (see Compl. at 6-7).

**\*5** "While the subjective element of the excessive force standard is inherently an inquiry into [the] defendant's state of mind, [the] plaintiff need not offer particular evidence of [the] defendant's mental state ... [and may] satisf[y] his burden on this element by merely pleading a scenario in which the use of force could not have been in good faith." Santiago v. Campisi, 91 F. Supp. 2d 665, 673 (S.D.N.Y. 2000); see also Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir. 1997) ("Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind."). In this case, an unprovoked assault on an inmate who allegedly refused to succumb to the officers' taunts could not have been a good faith use of force or have served a legitimate penological purpose. Rodriguez therefore has alleged facts sufficient to satisfy the subjective component of an Eighth Amendment claim.

Turning to the objective component, because any malicious use of force to cause harm constitutes a per se Eighth Amendment violation, it likewise is satisfied with respect to the September 10 assault. See Walsh, 194 F.3d at 50; see also, e.g., D'Attore, 2012 WL 4493977, at \*14 (finding per se violation of Eighth Amendment where case "involve[d] an alleged use of force solely to harm an apparently vulnerable inmate"); Beckford v. Portuondo,

151 F. Supp.2d 204, 216 (N.D.N.Y. 2001) ("[W]hen a prison guard applies force against a prisoner that poses no reasonable threat simply because the guard loses his or her temper and wishes to wantonly inflict pain on the prisoner, a per se violation of the Eighth Amendment occurs."). This is true despite Rodriguez's limited allegations of physical injury. See Benjamin v. Flores, No. 11 Civ. 4216 (ARR), 2012 WL 5289513, at \*4 (E.D.N.Y. Oct. 23, 2012) ("[E]ven in the absence of significant injury, if a complaint may be construed to allege the malicious use of force, an excessive force claim should not be dismissed for failure to state a claim.") (citing Cole v. Fischer, 379 F. App'x 40, 42 (2d Cir. 2010) ); see also Wright v. Goord, 554 F.3d 255, 270 (2d Cir. 2009) ("[T]he absence of any significant injury ... does not end the Eighth Amendment inquiry, for our standards of decency are violated even in the absence of such injury if the defendant's use of force was malicious or sadistic.").

In sum, even if Rodriguez's claim that he suffered severe emotional and mental distress as a result of witnessing the September 10 assault may be somewhat farfetched, he has, at this early stage of the proceedings, pleaded facts sufficient to state an Eighth Amendment excessive force claim based on a transferred intent theory. As the Second Circuit recently observed, where "a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically, [the] Court has reversed summary dismissals of Eighth Amendment claims of excessive force even where the plaintiff's evidence of injury was slight and the proof of excessive force was weak." Harris v. Miller, 818 F.3d 49, 65 (2d Cir. 2016). It follows that the Defendants are not entitled to dismissal of this claim at this juncture. [7]

**\*6** Moreover, at this stage, Rodriguez need not allege with specificity which of the four individual defendants present during the September 10 assault – C.O.'s Allen and Williams and Captains Almodovar and Myke – beat or sprayed the other inmate. Although Rodriguez must establish personal involvement of the officers in order to recover compensatory damages against them on his Eighth Amendment claim, Farid, 593 F.3d at 249, an officer "is personally involved in the use of excessive force if the officer either: (1) directly participates in an assault; or (2) is present during the assault, and fails to intercede on behalf of the victim even though he had a reasonable opportunity to do so," Vesterhalt v. City

Case 9:21-cv-00814-GTS-ML   Document 110   Filed 11/13/23   Page 39 of 73

Rodriguez v. City of New York, Not Reported in Fed. Supp. (2016)

of N.Y., 667 F. Supp. 2d 292, 297 (S.D.N.Y. 2009) (citing Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 129 (2d Cir. 1997) ). Rodriguez therefore "need not establish who, among [the] group of officers, directly participated in the attack and who failed to intervene, as long as there was a realistic opportunity to intervene to prevent the harm from occurring." De Michele v. City of N.Y., No. 09 Civ. 9334 (PGG), 2012 WL 4354763, at *17 (S.D.N.Y. Sept. 24, 2012) (internal quotation marks omitted); see also Curley v. Village of Suffern, 268 F.3d 65, 72 (2d Cir. 2001) ("Failure to intercede results in liability where an officer observes excessive force is being used or has reason to know that it will be.").

Accordingly, the Defendants' motion to dismiss Rodriguez's Eighth Amendment excessive force claim against C.O.'s Allen and Williams and Captains Almodovar and Myke, arising out of the September 10 assault, should be denied.

### B. Transfer and Loss of Job Assignment

Rodriguez also alleges that, after he filed a grievance regarding the September 10 assault and September 11 threats, he was transferred from the MDC to Rikers Island, thereby losing his job assignment at the MDC. (Compl. at 24). Construing his pleadings liberally, Rodriguez arguably seeks to assert both a Fourteenth Amendment procedural due process claim and a First Amendment retaliation claim based on these facts.

#### 1. Fourteenth Amendment Procedural Due Process

The Fourteenth Amendment provides that a state may not deprive a person of liberty or property "without due process of law." U.S. Const. amend. XIV. To establish a procedural due process claim, a plaintiff first must show that he was deprived of a liberty or property interest. See Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 571 (1972); Finley v. Giacobbe, 79 F.3d 1285, 1296 (2d Cir. 1996). If such a deprivation occurred, the Court then must consider what process was due and whether it was provided. See Mathews v. Eldridge, 424 U.S. 319, 333-34 (1976).

Here, to the extent Rodriguez has attempted to state a due process claim, it clearly falters on the first of these two prongs. As a general rule, inmates have no constitutional right to be housed in or remain at any particular correctional facility.

See Meachum v. Fano, 427 U.S. 215, 225 (1976) (transfer among correctional facilities, without more, does not violate inmate's constitutional rights, even when conditions in one prison are "more disagreeable" or the prison has "more severe rules"); Prins v. Coughlin, 76 F.3d 504, 507 (2d Cir. 1996) ("[A] prisoner generally has no due process right to challenge a transfer from one facility to another."); Tinsley v. Goord, No. 05 Civ. 3921 (NRB), 2006 WL 2707324, at *5 (S.D.N.Y. Sept. 20, 2006) ("The fact that life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to a less desirable facility.") (internal quotation marks omitted). Nor does removal from a particular prison job assignment implicate a protected liberty interest. See Frazier v. Coughlin, 81 F.3d 313, 318 (2d Cir. 1996); Bussey v. Phillips, 419 F. Supp. 2d 569, 579 (S.D.N.Y. 2006).

Accordingly, the Defendants are entitled to dismissal of the Amended Complaint to the extent that Rodriguez seeks to assert a Fourteenth Amendment procedural due process claim as a result of his transfer to Rikers Island and consequent loss of his MDC job assignment.

#### 2. First Amendment Retaliation

**\*7** Under Section 1983, a First Amendment retaliation claim "may be brought 'if otherwise routine administrative [prison] decisions are made in retaliation for the exercise of constitutionally protected rights.' " LaBounty v. Gomez, No. 94 Civ. 3360 (DLC), 1997 WL 104959, at *5 (S.D.N.Y. Mar. 10, 1997) (quoting Gill v. Mooney, 824 F.2d 192, 194 (2d Cir. 1987) ). To state such a claim, a plaintiff must allege that: (a) he was engaged in constitutionally-protected activity; (b) the defendant took adverse action against him; and (c) there was a causal connection between the protected activity and the adverse action. Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004). However, "because prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, [courts] are careful to require non-conclusory allegations." Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks omitted).

Rodriguez alleges that he was transferred from the MDC to Rikers Island – thereby losing his job assignment at

Case 9:21-cv-00814-GTS-ML   Document 110   Filed 11/13/23   Page 40 of 73

Rodriguez v. City of New York, Not Reported in Fed. Supp. (2016)

the MDC – in retaliation for his filing of a grievance about the September 10 assault and September 11 threats. (Compl. at 24). This is sufficient to establish that he was engaged in a constitutionally protected activity. See Graham v. Henderson, 89 F.3d 75, 80 (2d Cir. 1996) ("[R]etaliation against a prisoner for pursuing a grievance violates the right[s] ... guaranteed by the First and Fourteenth Amendments and is actionable under [ Section 1983."); Mateo v. Fischer, 682 F. Supp. 2d 423, 433 (S.D.N.Y. 2010) ("It is well settled that the filing of a prison grievance is a protected activity.").

Rodriguez also has sufficiently alleged an adverse action. An "adverse action" in this context is defined as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Pidlypchak, 389 F.3d at 381. Judged by this standard, it is clear that Rodriguez's transfer from the MDC to Rikers Island was an adverse action. See Davis v. Kelly, 160 F.3d 917, 920 (2d Cir. 1998) ("[P]rison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights."); Inesti v. Hicks, No. 11 Civ. 2596 (PAC) (AJP), 2012 WL 2362626, at *16 (S.D.N.Y. June 22, 2012) (same). Moreover, even the mere loss of Rodriguez's job assignment at the MDC could potentially constitute an adverse action. See Mooney, 824 F.2d at 194 (finding "otherwise routine administrative decisions," such as job transfers, actionable under Section 1983 when made "in retaliation for the exercise of constitutionally protected rights").

Rodriguez further has alleged facts sufficient to show that there was a causal connection between his grievance and his transfer and loss of job assignment. To allege a sufficient causal connection, Rodriguez's allegations must support an inference that the protected conduct was "a substantial or motivating factor for the adverse actions taken by prison officials." Bennett, 343 F.3d at 137. Such a causal connection may be shown when the protected activity is followed closely in time by the adverse action. See Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009) (passage of six months between the protected activity and the alleged retaliatory action not too long to support an inference of causal connection). Although Rodriguez has not specified when he filed his grievance, it is clear that he must have

done so by September 25, 2014, when he gave his Complaint to prison officials for mailing. (See Compl. at 27). Since his transfer clearly also was effected by that date, there was at most a two-week gap between his grievance and transfer. Rodriguez therefore has sufficiently alleged a causal connection between his protected activity and the alleged retaliatory action based on temporal proximity alone.

**\*8** Finally, to the extent that Rodriguez seeks compensatory damages based on his First Amendment retaliation claim, he must establish the personal involvement of the officers. Farid, 593 F.3d at 249. To that end, Rodriguez alleges that, on September 11, C.O. Allen threatened him with having to "take the next bus to Rikers" if he did not comply with directives. (Compl. at 9). That same afternoon, Captain Almodovar threatened him with physical violence if he did not keep quiet about what he had witnessed on September 10. (Id. at 11). And on September 12, after Rodriguez had complained to him about the previous incidents, Captain Williams suggested that the officers involved would lie about what had happened to "cover their asses for the safety of their job." (Id. at 14). Construing these facts in the light most favorable to Rodriguez, it is at least plausible that one or more of the Defendants orchestrated Rodriguez's transfer to keep him from speaking up about what he had seen. When "circumstantial evidence of a retaliatory motive is sufficiently compelling, direct evidence is not invariably required." Bennett, 343 F.3d at 139. Rodriguez's case may, of course, be stronger against some of the officers than others, but at this early stage, he need not allege exactly how the transfer was arranged. See Smith v. Levine, 510 F. App'x 17, 20 (2d Cir. 2013) (district court erred by dismissing claim against officers plausibly involved in retaliatory transfer, despite "sparse descriptions" of one officer's participation).

Accordingly, the Defendants' motion to dismiss Rodriguez's First Amendment retaliation claim against the individual Defendants should be denied.

### C. Intentional Infliction of Emotional Distress

The Defendants construe Rodriguez's pleadings to include a claim under New York state law for the intentional infliction of emotional distress. (See Defs.' Mem. at 20-25.) They concede that the City timely received a notice of this claim from Rodriguez, but contend both that the notice was deficient, (id. at 21-23), and that even a properly noticed intentional infliction of emotional distress claim would be meritless, (id. at 23-25). There is no need to address

the procedural point because the Defendants' substantive argument clearly is correct.

Rodriguez alleges that, as a result of witnessing the September 10 assault, he began taking psychiatric medication, suffers from nightmares, flashbacks, and depression, and "hear[s] that inmate yell throughout the day in [his] mind over and over and over again." (Compl. at 21-22). He similarly alleges that, after being threatened, he was in constant fear for his life, and "paranoid" and "jumpy" around correctional officers. (Id.).

Under New York law, an intentional infliction of emotional distress claim requires proof of four elements: "(1) extreme and outrageous conduct[;] (2) intent to cause severe emotional distress[;] (3) a causal connection between the conduct and the injury[;] and (4) severe emotional distress." Bender v. City of N.Y., 78 F.3d 787, 790 (2d Cir. 1996) (citing Holwell v. N.Y. Post Co., 81 N.Y.2d 115, 121 (1993) ). The first of these elements requires the alleged misconduct to be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 303 (1983) (quoting Restatement of Torts (Second) § 46 cmt. d (1965) ). This is a difficult showing to make. Indeed, as the New York Court of Appeals noted in Holwell, every such claim to have come before the court has failed "because the alleged conduct was not sufficiently outrageous." 81 N.Y.2d at 122; accord Chanko v. Am. Broad. Co., 27 N.Y.3d 46, 57 (2016). Whether the conduct in this case meets the threshold is a question of law for the Court to decide. Sgarlata v. Viacom, Inc., Nos. 02 Civ. 7234, 03 Civ. 5228 (RCC), 2005 WL 659198, at *8 (S.D.N.Y. Mar. 22, 2005).

Suffice it to say, even if Rodriguez is given the benefit of every conceivable doubt, he has failed to allege intentional conduct by any of the Defendants sufficiently outrageous to give rise to an intentional infliction of emotional distress claim, no matter how distressed he may have been. Accordingly, to the extent that Rodriguez asserts a state law intentional infliction of emotional distress claim, it should be dismissed.

### D. Claims Against the City and Warden Cuin

**\*9** Rodriguez's only surviving claims are (1) an Eighth Amendment excessive force claim against C.O.'s Allen and Williams and Captains Almodovar and Myke, arising out of the September 10 assault on another inmate, and (2) a First Amendment retaliation claim against C.O.'s Allen and Williams and Captains Almodovar, Myke, and Williams. Rodriguez, however, has failed to allege facts sufficient to hold either the City or Warden Cuin liable for these violations.

#### 1. Municipal Liability

To prevail on a claim of municipal liability, a plaintiff must include in his complaint factual allegations suggesting the existence of an officially-adopted policy or custom of the municipality that caused his injury. See Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403-04 (1997); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). A plaintiff need not identify an express rule or regulation: "[i]t is sufficient to show, for example, that a discriminatory practice of municipal officials was so 'persistent or widespread' as to constitute 'a custom or usage with the force of law.' " Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 226 (2d Cir. 2004) (quoting Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 870-71 (2d Cir. 1992) ).

In his Amended Complaint, Rodriguez alleges only that his rights were violated. This does not amount to a showing that he was the victim of a policy or custom giving rise to municipal liability. See Ricciuti, 941 F.2d at 123 ("[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy."). Indeed, Rodriguez has failed to allege that there were any other incidents of inmate assaults or retaliatory transfers, and has not even suggested the existence of a policy or custom. This is insufficient to state a claim against the City. See McAllister v. N.Y.C. Police Dep't, 49 F. Supp. 2d 688, 705 (S.D.N.Y. 1999) ("Conclusory allegations of a municipality's pattern or policy of unconstitutional behavior are insufficient to establish a Monell claim, absent evidence to support such an allegation."). Accordingly, Rodriguez's claims against the City should be dismissed. [8]

#### 2. Warden Cuin

In Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995), the Second Circuit held that a plaintiff may establish a prison supervisor's personal involvement by showing that the supervisor either: (a) "participated directly in the alleged constitutional violation;" (b) "failed to remedy" the violation "after being informed of the violation through a report or appeal;" (c) "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;" (d) "was grossly negligent in supervising subordinates who committed the [violation];" or (e) "exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." Id. at 873; accord Mateo v. Fischer, 682 F. Supp. 423, 429-30 (S.D.N.Y. 2010). It is unclear whether, and to what extent, the five Colon categories have survived the Supreme Court's decision in Iqbal, 556 U.S. at 662. See Marom v. City of N.Y., No. 15 Civ. 2017 (PKC), 2016 WL 916424, at *14-15 (S.D.N.Y. Mar. 7, 2016). In any event, merely pleading that a defendant is a high-ranking prison official plainly is insufficient to establish personal involvement. Bellezza v. Holland, 730 F. Supp. 2d 311, 317 (S.D.N.Y. 2010) (citing Ayers v. Coughlin, 780 F.2d 205, 210 (2d Cir. 1985) ).

**\*10** Rodriguez has named as a defendant Warden Cuin, who was the superintendent of the MDC in 2014. He has not alleged, however, that Warden Cuin was personally involved in any of the incidents giving rise to this suit. Nor has he suggested that Warden Cuin encouraged, or was even aware of, the physical or verbal aggression of the other MDC officers or their participation in any retaliatory transfer. Indeed, Warden Cuin's name appears only in the caption, with no mention of him in the narrative. Accordingly, the Defendants' motion to dismiss all claims against Warden Cuin should be granted. See Carrasquillo v. City of N.Y., 324 F. Supp. 2d 428, 435 (S.D.N.Y. 2004) (dismissing a complaint against named defendants not discussed in complaint).

### E. Qualified Immunity

The Defendants also contend that the individual defendants are entitled to qualified immunity. Insofar as relevant, the Defendants assert that "there is no clearly established constitutional right to be free from merely witnessing force used on another individual," or, in the alternative, that it was objectively reasonable for the officers to believe that "using force on one individual would not violate the constitutional rights of another individual." (See Defs.' Mem. at 18). Curiously, they do not address the applicability of qualified immunity to Rodriguez's First Amendment retaliation claim.

The doctrine of qualified immunity entitles government actors performing discretionary functions to be shielded from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) ). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Walczyk v. Rio, 496 F.3d 139, 154 (2d Cir. 2007) (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001) ) (emphasis omitted).

At this early stage of the litigation, there is nothing to suggest that the rights underlying Rodriguez's surviving claims were not well established. "It is indisputable that freedom from the use of excessive force is a clearly established constitutional right." Atkins v. Cnty. of Orange, 372 F. Supp. 2d 377, 401 (S.D.N.Y. 2005). It is equally clear that a reasonable officer would have known that the malicious use of force for no penological purpose is unlawful. While creative, the Defendants' apparent argument that the officers are absolved of responsibility because their unconstitutional use of force had an unknown consequence fails. See, e.g., Robins, 60 F.3d at 1442 (9th Cir. 1995) ("This situation presents no new principles of which the officers could not have reasonably been aware regarding the constraints which the Eighth Amendment places on the actions of prison officials."). Similarly, "[r]etaliation claims have long been a fixture of First Amendment law. "Only a 'plainly incompetent' officer – or one who was intentionally violating the Constitution – would think it permissible to single out an inmate for adverse action because he spoke out against something that happened ... in the prison." Vincent v. Sitnewski, 117 F. Supp. 3d 329, 342 (S.D.N.Y. 2015) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) ). The Defendants therefore are not entitled to qualified immunity with respect to Rodriguez's surviving claims.

### F. Section 1997e(e)

Case 9:21-cv-00814-GTS-ML   Document 110   Filed 11/13/23   Page 43 of 73

Rodriguez v. City of New York, Not Reported in Fed. Supp. (2016)

Finally, the Defendants argue that Rodriguez is not entitled to recover damages for mental and emotional injuries because he has not alleged physical injury. (Defs.' Mem. at 14-15). The Prison Litigation Reform Act ("PLRA") provides in that regard that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e) ("Section 1997e(e)"). Courts have interpreted this language to mean that a prisoner "cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury." Thompson v. Carter, 284 F.3d 411, 417 (2d Cir. 2002). Section 1997e(e), however, does not contain any limitations on injunctive and declaratory relief, nominal and punitive damages, or damages for a mental or emotional injury suffered in addition to a physical injury. See id. at 418-19.

**11** At the outset, the Defendants mistakenly assume that, when no physical injury is alleged, the only injury that a plaintiff may suffer as a result of retaliation is mental or emotional harm. The Second Circuit has held, however, that intangible deprivations of liberty and personal rights are distinct from claims for pain and suffering, mental anguish, and mental trauma. See Kerman v. City of N.Y., 374 F.3d 93, 125 (2d Cir. 2004) ("The damages recoverable for [a plaintiff's Fourth Amendment claims] are separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional suffering."). Accordingly, the PLRA's physical injury requirement does not bar an award of compensatory damages for First Amendment violations. Rosado v. Herard, No. 12 Civ. 8943 (PGG) (FM), 2013 WL 6170631, at *10-11 (S.D.N.Y. Nov. 25, 2013); see also Lipton v. Cnty. of Orange, N.Y., 315 F. Supp. 2d 434, 457 (S.D.N.Y. 2004) (an exception to the PLRA's physical injury requirement exists where a prisoner's claims arise under the First Amendment); Cancel v. Mazzuca, 205 F. Supp. 2d 128, 138 (S.D.N.Y. 2002) (the PLRA "does not present an obstacle to" First Amendment claim).

Furthermore, even when a claim is potentially subject to the PLRA's limitation, the prisoner need not plead physical injury in his complaint. Rosado, 2013 WL 6170631, at *11 (denying motion to limit damages pursuant to Section

1997e(e) because, "at the motion to dismiss stage, the Court cannot, and need not, conclusively resolve the factual question of whether or not the plaintiff suffered physical injury in addition to his claimed mental and emotional injury") (quoting Frieson v. City of N.Y., No. 11 Civ. 4611 (JGK), 2012 WL 1948782, at *2 (S.D.N.Y. May 30, 2012) ). In any event, Rodriguez has in fact pleaded some facts potentially suggesting physical injury – namely, that his inhalation of the chemical agent used on the other inmate caused him to choke and have an asthmatic episode. (See Compl. at 6-7). The Defendants' request to foreclose Rodriguez from receiving any compensatory damages therefore is premature.

## V. Conclusion

For the foregoing reasons, the Defendants' motion to dismiss the Amended Complaint, (ECF No. 26), should be granted in part, and denied in part. Specifically, the motion should be denied with respect to Rodriguez's Eighth Amendment excessive force claim against C.O.'s Allen and Williams and Captains Almodovar and Myke, arising out of the September 10 incident, as well as his First Amendment retaliation claim against those defendants and Captain Williams. All other claims that Rodriguez asserts should be dismissed.

## VI. Notice of Procedure for Filing Objections to this Report and Recommendation

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul G. Gardephe, to my chambers at the United States Courthouse, 500 Pearl Street, New York, N.Y. 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Gardephe. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).

SO ORDERED.

Rodriguez v. City of New York, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00814-GTS-ML    Document 110    Filed 11/13/23    Page 44 of 73

**All Citations**

Not Reported in Fed. Supp., 2016 WL 11483837

## Footnotes

1    By order dated March 17, 2015, Your Honor cautioned Rodriguez that the Amended Complaint would "replace, not supplement," the original complaint. (See ECF Nos. 1 ("Complaint" or "Compl."), 15). It appears that Rodriguez intended the Amended Complaint to differ from his earlier Complaint only by amending the caption and filling in blanks in the narrative with the true names of the John Doe defendants. Despite Your Honor's directive, however, the Amended Complaint is missing seven substantive pages, (see Compl. at 6, 8, 9, 12, 14, 22, 23), and arranged out of order. In light of Rodriguez's pro se status, I therefore have considered both pleadings. For ease of reference, all citations are to the Complaint. I further have presumed that blanks in the Complaint have been completed by inserting the correct names, where relevant.

2    Most of the prisoners at the MDC are pretrial detainees. See www.nyc.gov/site/doc/about/facilities.page (last visited July 29, 2016). The City indicates, however, that Rodriguez was a sentenced inmate. (See ECF No. 27 (Decl. of Asst. Corp. Counsel Richard Bahrenburg, dated Oct. 9, 2015), ¶ 5).

3    It is now clear that these five officers were: (A) Captain Almodovar, whom Rodriguez initially identified only by shield number and erroneously believed to be a C.O., (see Compl. at 1-2, 5; Am. Compl. at 1, 4); (B) C.O. Williams, whom Rodriguez initially identified only by shield number, (see Compl. at 1-2, 6; Am. Compl. at 1); (C) C.O. Allen, (Compl. at 9); (D) Captain Myke, whom the City indicated was present, (see ECF No. 13); and (E) C.O. Handly, a non-party to this action, (Compl. at 5).

4    Rodriguez identifies this individual only as "a capt[a]in." (Id.). Since he refers to the individual later identified as Captain Almodovar as a separate actor in the next sentence of his narrative, I have assumed that the unidentified captain was in fact Captain Myke, the only other supervisor present.

5    Captain Williams is someone different than C.O. Williams. Captain Williams is evidently a supervisor who was not present during the September 10 assault.

6    In their motion, the Defendants also address a potential Eighth Amendment deliberate indifference to medical needs claim arising out of Rodriguez's interaction with Captain Williams on September 12. (See ECF No. 28 (Defs.' Mem. of Law in Supp. of Mot. to Dismiss ("Defs.' Mem.") at 10-11). To prevail on such a claim, a prisoner must show that (1) objectively, the deprivation of care was a "sufficiently serious" violation of his constitutional rights, and (2) subjectively, that the defendant had a state of mind of "deliberate indifference" to his health or safety. See Farmer v. Brennan, 511 U.S. 825, 834 (1994). Even construed liberally, however, Rodriguez's pleadings do not suggest that he was denied care – in fact, he clearly states that he accepted Captain Williams' prompt offer to see a psychiatrist. (See Compl. at 13-15). He consequently has failed to state a deliberate indifference claim.

7    It is clear, however, that Rodriguez cannot state an Eighth Amendment excessive force claim based on the events of September 11, when he arguably was threatened by some of the Defendants. As a matter of law, verbal abuse, threats, and intimidation standing alone, unaccompanied by injury or damage, do not amount to a constitutional deprivation. See Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir. 1986) (name-calling without "any appreciable injury" is not a constitutional violation); Jean-Laurent v. Wilkerson, 438

Rodriguez v. City of New York, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00814-GTS-ML    Document 110    Filed 11/13/23    Page 45 of 73

F. Supp. 2d 318, 325 (S.D.N.Y. 2006) ("[V]erbal intimidation does not rise to the level of a constitutional violation."). Accordingly, insofar as Rodriguez's Eighth Amendment excessive force claims against C.O. Allen and Captain Almodovar arise out of the September 11 threats, they should be dismissed.

8    There is no indication that Rodriguez seeks to name any of the individual defendants in their official capacities. Moreover, a damages claim against an official can only be asserted under ⚑Section 1983 if the official is sued in his personal capacity. ⚑Al-Jundi v. Estate of Rockefeller, 885 F.2d 1060, 1065 (2d Cir. 1989). Even if that were not so, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity [of which the officer is an agent]." ⚑Kentucky v. Graham, 473 U.S. 159, 166 (1985). Accordingly, if Rodriguez had named the individual defendants in both their official and personal capacities, the official capacity claims would have to be dismissed for the same reason that the City is entitled to dismissal.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Overruling Risk - Negative Treatment

Overruling Risk    Pearson v. Callahan,    U.S.,    January 21, 2009

2005 WL 2137805

Only the Westlaw citation is currently available.

United States District Court,

E.D. New York.

Johnnie L. PETWAY, Plaintiff,

v.

CITY OF NEW YORK, New York City Police
Department, New York City Fire Department, Emergency
Medical Services Command of the New York City Fire
Department, Police Officer Robert Grau, Police Officer
Ernest Barone (Shield # 25445), Sergeant Anthony
Motolla (Shield # 03687), EMS Lt. Joanne Miller,
James McDermott, Richard Hickey, New York City
Fire Department Fireman John Doe # 1, New York City
Fire Department Fireman John Doe # 2, Defendants.

No. 02-CV-2715 (NGG)(LB).
|
Sept. 2, 2005.

**Attorneys and Law Firms**

Charles H. Ryans, Jr., New York, NY, for Plaintiff.

Mary Theresa O'Flynn, Corporation Counsel of the City of
New York, New York, NY, for Defendants.


*MEMORANDUM & ORDER*

GARAUFIS, J.

**\*1** In this action, Johnnie Petway (the "Plaintiff") brings
suit against the defendants (collectively, "Defendants")
pursuant to 42 U.S.C. § 1983 and various state tort laws.
Specifically, the Plaintiff seeks relief for violations of his
Fourth and Fourteenth Amendment rights and for state-law
tort causes of action which include assault, battery, and
false imprisonment. At this time, the court considers the
Defendants' motion for summary judgment, pursuant to Rule
56 of the Federal Rules of Civil Procedure. For the reasons set
forth below, the motion is granted in part and denied in part.

I. Background

On January 30, 2001, the Plaintiff was in his living quarters
at 556 Gates Avenue in Brooklyn, New York. (Am. Compl.
at 2.) He smelled smoke, went to investigate, and saw a small
fire in his hallway. (*Id.*) After seeing the fire, the Plaintiff went
downstairs to find a fire extinguisher. (*Id.*) As he descended
the stairway, the lights went off. (*Id.*) The Plaintiff's pets
were still upstairs, and fearing for their safety, he rushed back
towards his apartment. (*Id.*) As he was going up the stairs, the
Plaintiff slipped, fell, and sustained burns on his right hand,
his fingers, his thumb, his left ear, and the left side of his face.
(*Id.*) When he returned upstairs, he saw that the fire had begun
to rage out of control. (*Id.*) The Plaintiff then opened the door
to his residence, and two of his dogs escaped with him down
the stairs. (*Id.* at 3.) Three of his dogs, however, remained
inside as the Plaintiff determined that the fire was too intense
for him to attempt to rescue them. (*Id.*)

Once outside, he yelled for someone to call 911. (*Id.*) The
New York City Fire Department ("FDNY") soon arrived.
(*Id.*) Immediately upon their arrival, the Plaintiff approached
Battalion Chief Richard Hickey. (*Id.*) He explained to Hickey
that his dogs were upstairs and Hickey assured the Plaintiff
that they would rescue the dogs. (*Id.*) The Plaintiff, however,
observed that no efforts were being made to rescue the dogs
or to put out the fire. (Petway Dep. at 63.) As a result, the
Plaintiff again approached Hickey and asked him why no one
was trying to rescue his pets or put water on the fire. (*Id.*)
Hickey told him to "get out of here." (*Id., Am. Compl. at 3.)
Believing his question to be reasonable, the Plaintiff asked
Hickey again when he would rescue the pets. (*Id.* at 63-64.)
Hickey told him, "Get the hell out of here." (*Id., Am. Compl.
at 3-4.) Soon afterwards, two or three firemen grabbed the
Plaintiff, shoved him, and told him "to get the fuck out of
here." (Am. Compl. at 3-4.) The Plaintiff identified one of
these firemen as Lieutenant James McDermott. (Petway Dep.
at 66.)

A shoving match ensued between the firemen and the Plaintiff
and the Plaintiff refused to be pushed back away from his
home any further. (*Id.* at 70-71.) At that point, according
to the Plaintiff, Lt. McDermott took off his helmet, and
struck the Plaintiff in the head with it. (*Id.* at 71, 72-74, 76.)
Police Officer Ernest Barone then handcuffed the Plaintiff's
wrists behind his back. (*Id.* at 77, 80.) The Plaintiff alleges
that Lt. McDermott punched him once again while he was
handcuffed, specifically that McDermott struck him in the
face with such force that he broke the Plaintiff's nose. (*Id.*

at 77, 80-81, 83.) Shortly afterwards, the handcuffs were removed. (*Id.* at 80.)

**\*2** Two police officers then escorted the Plaintiff across the street. (*Id.* at 86.) The Plaintiff was told that he would be brought to the hospital. (*Id.* at 86.) The Plaintiff responded that he "wasn't looking to go to the hospital." (*Id.* at 86-87.) The Plaintiff was then informed by EMS Officers, Lieutenant Joanne Miller and Sergeant Anthony Motolla that he had no choice in the matter and that he would be brought to the hospital against his will if necessary. (*Id.* at 87.) The Plaintiff was told that he could go to the hospital "voluntarily and willingly" or that he would be brought to jail and transported to the hospital from there. (*Id.*) The Plaintiff continued to protest. (*Id.*) Lt. Miller explained that they could bring him to the hospital even against his wishes if they determined that his condition was a matter of life and death. (*Id.* at 87.) Sgt. Motolla told the Plaintiff that if he did not cooperate, they would "threaten to tranquilize" him. (*Id.*) The Plaintiff expressed concerns about physical ailments he suffered and medication he took, and the possibility of an allergic reaction to tranquilization. (*Id.*) Ultimately, facing the threat of tranquilization, the Plaintiff agreed and went to the hospital. (*Id.*) He was brought initially to the emergency room. (*Id.* at 94.) Afterwards, he was brought to the burn unit, where he remained for over two weeks. (*Id.* at 95.)

Proceeding pro se and *in forma pauperis,* the Plaintiff filed his initial complaint on April 29, 2002. (April 29, 2002 Compl.) On February 14, 2003, he filed an amended complaint. (Feb. 14, 2003 Am. Compl.) In August of that year, the Plaintiff retained Charles Ryans as his attorney. (Aug. 12, 2003 Notice of Appearance by Charles H. Ryans, Jr.) Discovery was completed on November 8, 2004. (Oct. 18, 2004 Order.) On March 4, 2005, the Defendants moved for summary judgment. (March 4, 2005 Notice of Motion for Summary Judgment.)

II. Discussion

Summary judgment is proper when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c).* The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, the court must construe the facts in the light most favorable to the non-moving party, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and all reasonable inferences and ambiguities are to be resolved against the non-moving party. *Flanigan v. Gen. Elec. Co.,* 242 F.3d 78, 83 (2nd Cir.2001). Where there are no such genuine issues of fact, and all facts, inferences, and ambiguities are construed in favor of the non-moving party, summary judgment for the moving party is appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Mack v. Otis Elevator Co.,* 326 F.3d 116, 119-20 (2d Cir.2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

*A. Claims Against NYPD, FDNY, and EMS*

**\*3** The Defendants contend, and indeed the Plaintiff does not dispute, that the Plaintiff's claims against the New York City Fire Department ("FDNY"), the New York City Police Department ("NYPD"), and the Emergency Medical Services Command of the New York City Fire Department ("EMS") should be dismissed on summary judgment because these three entities are not suable. *See Parker v. DeBuono,* 98 Civ. 5765, 1999 WL 771365 (S.D.N.Y. Sep.28, 1999), at \*2 (N.Y.PD, EMS, and FDNY are not suable entities); *McAllister v. New York City Police Dep't,* 97 Civ. 7420, 1998 WL 314732, at \*1 (S.D.N.Y. June 15, 1998) (N.Y.PD is not a suable entity). "Pursuant to Rule 17(b) of the Federal Rules of Civil Procedure, the capacity [of a government agency] to sue or be sued must be determined by the law of the State in which the district court is held. The State of New York has neither expressly given nor necessarily implied that the NYPD, FDNY or EMS can sue or be sued in their individual capacities." *Parker,* 1999 WL 771365, at \*2 (citations and quotations omitted). [1] Plaintiff's claims against the FDNY, NYPD and EMS are therefore dismissed.

*B. Verbal Harassment and 42 U.S.C. § 1983*

The Defendants argue that to the extent the Plaintiff bases his § 1983 claim on verbal harassment by the defendants, it ought to be dismissed because verbal abuse does not amount to a violation of a federally protected right. (Defs. Mem. at 17.) "Generally, mere verbal abuse, and even vile language, does not give rise to a cognizable claim under 42 U.S.C. § 1983." *Beal v. City of New York,* 92 Civ. 0718, 1994 WL 163954, at \*6 (S.D.N.Y. April 22, 1994); *see also Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996)

("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983."). Verbal threats do not typically amount to a violation of § 1983 unless they rise to the level of a 'brutal and wanton act of cruelty.' *Beal,* 1994 WL 163954, at \*6. In rare cases where a defendant has been held liable under § 1983 for verbal threats, the cases have involved "threats that were grossly disproportionate to the need for action under the circumstances, and that were inspired by malice rather than merely careless or unwise excess of zeal so that [they] amounted to an abuse of official power that shocks the conscience." *Id.* (citations and quotations omitted).

In the present case, the Plaintiff alleges that FDNY personnel told him to get out of the way, to "get the hell out of here," and to "get the fuck out of here." (Petway Dep. at 63-65, Am. Compl. at 3-4.) In addition, the Plaintiff claims that Sgt. Motolla threatened to tranquilize the Plaintiff when he refused to go to the hospital. (Petway Dep. at 88.) Given that at the time a fire was raging and Plaintiff was bloodied and suffering from severe burns over his face, ear, hand, and fingers, *see* Pl. Am. Compl. at 2; Petway Dep. at 85, 88, 95; Miller Dep. at 25, the statements made here by government officials cannot reasonably be considered "brutal or wonton" cruelty. Nor do these statements "shock the conscience" in light of the circumstances and Plaintiff's medical condition. Moreover, the Plaintiff himself states that he has made no claim of verbal harassment. (Pl. Opp. at 20.) Claims of verbal harassment under § 1983 are therefore dismissed. [2]

### C. Officer Grau

**\*4** The Defendants contend, in addition, that claims against Officer Grau ought to be dismissed because the Plaintiff has conceded that Officer Grau did nothing to him. (Defs. Mem. at 5.) The Plaintiff made no response to this contention. At his deposition, the Plaintiff acknowledged that there was "nothing between [him] and Mr. Grau" and that Officer Grau had done "absolutely nothing" to him as far as he knew. (Petway Dep. at 112-13.) A plaintiff must at least allege that he suffered an injury by a defendant for his claim against that defendant to survive summary judgment. *Wachtler v. County of Herkimer,* 35 F.3d 77, 82 (2d Cir.1994); *see also* *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (a concrete and particularized injury that is traceable to challenged action of the defendant is required for a plaintiff to have standing to

bring a claim). Here, since the Plaintiff does not allege that Officer Grau caused him any injury, the Plaintiff's claims against Officer Grau are dismissed.

### D. Unidentified Officers

#### i. Rule 4(m) of the Federal Rules of Civil Procedure

The Defendants argue that the claims of excessive force against two unnamed officials should be dismissed because the Plaintiff has failed to identify these parties in the nearly three years that have passed since the start of this litigation. (Defs. Mem. at 8.) In response, the Plaintiff argues that the unknown identities of these two officials merely raises an issue of fact that should be left for the jury to decide. (Pl. Opp. at 5.) In addition, the Plaintiff requests that the court order the Defendants to produce documents that the Plaintiff has previously sought so that he might better be able to identify the unnamed individuals. (*Id.* at 5-6.) The Defendants further argue that even if the claims are not dismissed for lack of identification, they should nonetheless be dismissed because the officers' actions were reasonable under the circumstances. (*Id.*) Because the court determines that the claims should be dismissed due to untimely service, it need not address the issue of the reasonableness of the officials' acts.

As a general rule, federal courts disfavor the use of unidentified "John Doe" defendants, but recognize that in certain situations a plaintiff may not be in a position to know the actual identity of a defendant and therefore should be permitted to proceed against an unidentified party. *Covington v. Warden of C-95,* 93 CV 1958, 1996 WL 75211, at \*4 (E.D.N.Y. Feb.8, 1996). Nonetheless, a plaintiff's obligation to serve a defendant in a timely fashion is not waived merely because a plaintiff has filed a complaint against an unnamed party. *Cammick v. City of New York,* No. 96 Civ. 4374, 1998 WL 796452, at \*1 (S.D.N.Y. Nov.17, 1998). The Federal Rules of Civil Procedure direct that a party serve a defendant within 120 days of filing the complaint. Fed.R.Civ.P. 4(m). In the event that a plaintiff fails to serve process upon a defendant within that time period, the court "shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period." *Id.*

**\*5** Here, the Plaintiff originally filed his complaint on April 29, 2002. (*See* Apr. 29, 2002 Compl.) In the more than three years that have passed since then, he has not identified the

Petway v. City of New York, Not Reported in F.Supp.2d (2005)

John Doe defendants and has therefore not served process upon them. This failure is not the result of lack of opportunity. Magistrate Judge Bloom extended the discovery deadline on several occasions to accommodate requests made by the Plaintiff. (*See* April 9, 2004 Order; Aug. 3, 2004 Order; Sept. 29, 2004 Order; October 18, 2004 Order.) The Plaintiff has had over three years, far more than the typical 120 day time period, to identify and serve the John Doe defendants, and the court is under no obligation to extend the deadline indefinitely. *See Thomas v. Keane,* No. 99 Civ. 4302, 2001 WL 410095, at *1, *5 (S.D.N.Y. April 23, 2001) (dismissing claim under Rule 4(m) where the pro se plaintiff failed to serve John Doe defendants within roughly two years of filing complaint); *Cammick,* 1998 WL 796452, at *1 (dismissing a claim under Rule 4(m) where the plaintiff failed to serve John Doe defendants within two years and five months of filing complaint); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *5 (N.D.N.Y. Oct. 1, 1998) (dismissing a claim under 4(m) where the pro se plaintiff failed to serve John Doe defendants within a year of filing his complaint). The court therefore dismisses without prejudice the claims against the unidentified defendants for lack of timely service.

### ii. Plaintiff's Motion to Compel

In an effort to discover the identities of the John Doe defendants, the Plaintiff urges the court to compel the Defendants to respond to three previously made document requests. (Pl. Opp. at 6.) The court denies this motion. The Plaintiff's first document request was made orally, and the Defendants requested that it be put in writing. (McDermott Dep. at 13-14.) The Plaintiff did not object to the Defendants' request, nor has the Plaintiff provided evidence that he put this request in writing. (Defs. Reply at 5.) The Plaintiff's second document request was answered by the Defendants. (Defs. Sept. 13, 2004 letter.) With respect to the third document request, Magistrate Judge Bloom ordered that it need not be answered due to the request's untimeliness. (Magistrate Judge Bloom Oct. 18, 2004 Order.)

Although the Plaintiff has been given previous extensions and has been provided with ample opportunity to identify the John Doe defendants, he again seeks to extend the deadline for discovery. The court declines to do so. *See Trebor Sportswear Co. v. The Limited Stores, Inc.,* 865 F.2d 506, 511 (2d Cir.1989) (denying further discovery when the party opposing summary judgment had a "fully adequate opportunity for discovery"); *see also Burlington Coat*

*Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 927 (2d Cir.1985) (denying plaintiff's request to reopen discovery when plaintiff had "ample time in which to pursue the discovery that it now claims is essential"). Here, the Plaintiff himself failed to make one request in writing, made one untimely request, and has already received an answer to a third request. He has been given adequate time to conduct discovery and is not entitled to further extensions. Consequently, the court refuses to compel discovery of these documents.

### E. Adequacy of Service Upon Lieutenant Miller

**\*6** The Defendants also contend that claims against Lt. Miller should be dismissed on the grounds of failure to serve process. (Defs. March 4, 2005 Statement at 2.) The Plaintiff responds that due to the fact that the Plaintiff began this proceeding pro se and *in forma pauperis,* service upon Lt. Miller's should effectively be excused. (Pl. Resp. at 1.)

As explained above, a cause of action is subject to dismissal if a plaintiff has failed to serve a defendant with a summons and complaint within 120 days after filing the complaint. Fed.R.Civ.P. 4(m). While pro se litigants should be afforded a degree of latitude, they are nevertheless generally required "to inform themselves regarding procedural rules and to comply with them." *LoSacco v. City of Middleton,* 71 F.3d 88, 92 (2d Cir.1995). Where a pro se plaintiff is confused about requirements detailed in Rule 4, the court may extend the 120-day deadline. *Herrera v. New York Tel. Co.,* 93 Civ. 2599, 1995 WL 405842, at *1 (S.D.N.Y. July 10, 1995). Nevertheless, courts may dismiss cases for failure of service after an appropriate amount of time. *See Thomas,* 2001 WL 410095, at *1, *5 (dismissing pro se claim about two years after filing complaint); *Waldo,* 1998 WL 713809, at *5 (dismissing pro se claim within a year of filing complaint).

Here, three years have passed since the Plaintiff filed his initial complaint. The failure to serve is not due to confusion concerning the service of process rule. Indeed, the Plaintiff properly served other defendants, and provided proof of such service to the court. (*See, e.g.,* Aug. 8, 2002 Summons; March 25, 2003 Summons.) Furthermore, although the Plaintiff initially brought his case pro se, he has had the guidance of retained counsel for almost two years. (*See* Aug. 12, 2003 Notice of Appearance.) In that almost two-year period, however, there has been no showing that Lt. Miller was ever properly served. *Cf. Herrera,* 1995 WL 405842, at *1 (refusing to dismiss case despite untimely service because the

litigant began the case pro se but later retained counsel who promptly remedied the failure of service). Dismissal of claims against Lt. Miller for lack of service is therefore appropriate. [3]

### F. 🚩 *42 U.S.C. § 1983 Claims Against the City of New York*

The Defendants further maintain that the Plaintiff's 🚩 § 1983 claims against the City of New York should be dismissed because the Plaintiff has failed to demonstrate that a municipal policy was the cause of the alleged violations. [4] (Defs. Mem. at 18.) Title forty-two U.S.C. § 1983 provides a cause of action against any person who, under color of state law, violates rights or privileges established under the Constitution or law of the United States. Local governments are considered a "person" for 🚩 § 1983 purposes and can therefore be sued under the statute. 🚩 *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, a local government is not liable under 🚩 § 1983 for injury which is merely the result of a government employee's conduct, but rather only when the injury at issue is the result of an adopted municipal policy or custom. 🚩 *Monell,* 436 U.S. at 690; *see also* 🚩 *Coon v. Town of Springfield,* 404 F.3d 683, 686 (2d Cir.2005).

#### i. Failure to Train

**\*7**  In his amended complaint, the Plaintiff alleges that New York City should be held liable for its failure to train its "uniformed members" properly. (Am. Compl. at 6.) The Supreme Court has held that a municipality may be held liable for failure to train its employees where it acts with " 'deliberate indifference' to the rights of persons with whom the police come into contact." 🚩 *City of Canton,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The Second Circuit elaborates:

*City of Canton* requires that plaintiffs establish not only that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference, but also that plaintiffs identify a specific deficiency in the city's training program and establish that that deficiency is "closely related to the ultimate injury," such that it "actually caused" the constitutional deprivation. Thus, the Supreme Court emphasized in *City of Canton* that plaintiffs must establish that "the officer's shortcomings ... resulted from ... a faulty training program" rather than from the negligent

administration of a sound program or other unrelated circumstances.

🚩 *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 129 (2d. Cir.2004) (citing 🚩 *Canton,* 489 U.S. at 390-91). Here, even when specifically called upon to support his 🚩 § 1983 claim against the city, the Plaintiff has provided no evidence of a specific deficiency in New York City's training program or the deficiency's close relationship to his injury. The court therefore dismisses the Plaintiff's 🚩 § 1983 claim concerning the City's alleged failure to properly train its employees.

#### ii. Failure to Supervise

In his amended complaint, the Plaintiff also argues that New York City failed to properly supervise its "uniformed members." (Pl. Am. Compl. at 6.) To survive summary judgment, a claim for failure to supervise must also be supported by evidence of a municipal policy or custom which caused the injury. 🚩 *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir.1995). In a failure to supervise case, a plaintiff must typically establish that "a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was 'obvious,' and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." 🚩 *Amnesty America,* 361 F.3d at 128 (citations and quotations omitted).

Here, the Plaintiff has provided no evidence that a policymaking official had notice of a potentially serious problem of constitutional conduct, that the need for corrective supervision was obvious, or that any inaction was due to deliberate indifference. In short, the Plaintiff has provided no evidence to prove a required element for a valid 🚩 § 1983 claim against the City of New York. Consequently, the court must dismiss the Plaintiff's claim alleging New York City's failure to supervise.

### G. Claims Against Lt. McDermott

#### i. Identification of Lieutenant McDermott

**\*8**  The Defendants assert that the Plaintiff's claims against Lt. McDermott must be dismissed because there is doubt as to

whether the Plaintiff has properly identified him. (Defs. Mem. at 10.) Specifically, they argue that there are inconsistencies in the record which suggest that the Plaintiff may have misidentified Lt. McDermott as the person who allegedly struck the Plaintiff with his fist and with his helmet. (*Id.*) The Plaintiff, however, contends that he sufficiently identified Lt. McDermott, and that the claim against him should therefore not be dismissed on summary judgment. (Pl. Opp. at 2-4.)

For summary judgment purposes, the court resolves all ambiguities and draws all inferences in favor of the non-moving party. *Schwabenbauer v. Board of Education,* 667 F.2d 305, 313 (2d Cir.1981). Here, the Plaintiff alleges that he was struck twice. (Petway Dep. at 71, 82-83.) He believed that his assailant was "approximately" five feet ten inches tall and that he was no taller than six feet. (*Id.* at 66.) A witness, who testified that a fireman struck the Plaintiff, did not remember distinctly how tall the person was who struck the Plaintiff, but indicated that he was about six feet ten inches tall while wearing a helmet. (Lyons Dep. at 34-36.) Lt. McDermott is five feet seven and a half inches tall. (McDermott Aff. at 1.) Thus, because the Plaintiff and a witness believe the alleged tortfeasor to be taller than Lt. McDermott actually is, the Defendants urge the court to dismiss the case against Lt. McDermott. The court declines to do so.

The court must draw all inferences in the Plaintiff's favor, and it is reasonable to infer that the Plaintiff and witness could have misjudged Lt. McDermott's height. First, the Plaintiff believed his tortfeasor to be only two and a half inches taller than Lt. McDermott actually is, a relatively minimal and easily mistakable difference. Second, the alleged tortfeasor was wearing his helmet and, presumably, his boots, and these articles of clothing would have made him appear taller than he was. Third, the Plaintiff and witness were not in a situation where they had the opportunity to carefully observe the alleged's tortfeasor's exact measurements. Thus, viewing the facts in the light most favorable to the Plaintiff, the court denies the Defendants' motion to dismiss the cause of action against Lt. McDermott on account of the inaccurate assessments of Lt. McDermott's height.

### ii. Excessive Force

As an alternative argument, the Defendants urge that even if the Plaintiff sufficiently identified Lt. McDermott, the Lieutenant's acts were reasonable in light of the circumstances and therefore did not violate Plaintiff's constitutional rights.[5] (Defs. Mem. at 11.) The Plaintiff counters that Lt. McDermott

did not act reasonably, and asserts additionally that the reasonableness of McDermott's acts should in any event be resolved by a trier of fact. (Pl.Opp.8-12.)

The Fourth Amendment protects against "unreasonable" seizures. *See Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "The 'reasonableness' of a particular seizure depends not only on *when* it was made, but also on *how* it is carried out." *Id.* (emphasis in original). Thus a plaintiff can "prevail on his excessive force claim if he is able to show that [a government officer] used more force than was necessary to subdue him." [6] *Curry v. City of Syracuse,* 316 F.3d 324, 332 (2d Cir.2003). Determining whether a particular seizure was reasonable is a fact-intensive process, requiring careful consideration of the facts and circumstances of the particular case, including the severity of the crime and the dangerousness of the suspect. *Graham,* 490 U.S. at 395. The officer's actions also must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 395; *see also Saucier v. Katz,* 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (citing *Graham*). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham,* 490 U.S. at 397. In an excessive force case, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham,* 490 U.S. at 397; *see also Saucier,* 533 U.S. at 204-5 (citing *Graham*).

**\*9** The facts of this case, viewed in the light most favorable to the non-moving party, unfold as follows. The Plaintiff escaped from a burning building, and emerged injured and very concerned about his three dogs that remained trapped inside. (Am. Compl. at 2-3.) Firefighters eventually arrived, and the Plaintiff approached Chief Hickey to ask about efforts being made to save his dogs. (*Id.* at 7) Although the Plaintiff was assured his dogs would be rescued, he asked Chief Hickey a second time after no efforts were made to do so. (Am. Compl. at 3; Petway Dep. at 63-64.) Chief Hickey then verbally reprimanded the Plaintiff to move away and two firemen began shoving him. (*Id.* at 64-65.) As the Plaintiff protested being shoved, he was again verbally reprimanded, at which point Lt. McDermott took off his helmet and struck the Plaintiff in the head with it. (*Id.* at 72-74.) The Plaintiff's

hands were still at his side when he was struck. (*Id.* at 74.) Officer Barone then handcuffed the Plaintiff's wrists tightly behind his back. (*Id.* at 80.) While handcuffed, Lt. McDermott struck the Plaintiff again, this time in the face and with such force that it may have broken his nose. (*Id.* at 83.)

When one considers this scenario from an on-the-scene perspective, Lt. McDermott's use of force was clearly excessive. Lt. McDermott allegedly struck the Plaintiff in his head even though the Plaintiff's arms were at his sides and seemingly posed no physical threat. Plaintiff's wrists were then securely handcuffed behind his back. Thus restrained, the Plaintiff appeared to be of no danger to himself or to others. Nor is there any indication that the Plaintiff was trying to escape. Nevertheless, while the Plaintiff was restrained and in this vulnerable position, Lt. McDermott allegedly punched him in the face so forcefully that it broke the Plaintiff's nose. Viewed in this light, the facts indicate the use of unreasonable force in violation of the Plaintiff's Fourth Amendment rights, and thus Plaintiff's excessive force claim will not be dismissed on summary judgment.

### iii. Qualified Immunity

The Defendants argue, in addition, that Lt. McDermott should be entitled to qualified immunity since he reasonably believed his actions to be lawful. (Defs. Memo. at 12-13.) They maintain that a reasonable officer "could have believed that exerting some force to remove the plaintiff from the scene was an appropriate response in these circumstances." (Defs. Mem. at 13.) Where a defendant claims qualified immunity, and moves for summary judgment on this ground, the court engages in a two step analysis. *Saucier,* 533 U.S. at 201. The initial inquiry is whether, viewed in the light most favorable to the injured party, the facts alleged demonstrate that the officer's conduct violated a constitutional right. *Id.* If there has been no constitutional violation made out on the alleged facts, the inquiry ends. If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* If a right has not been clearly established, then an official, acting unconstitutionally, is not on notice that his conduct is unlawful. *Id.* at 202. In the absence of such notice, summary judgment based on qualified immunity is appropriate. *Id.*

**\*10**  As described above, the facts alleged indicate that Lt. McDermott used excessive force and thus violated the Fourth Amendment. The court, therefore, proceeds to the second step of the *Saucier* analysis and asks whether this violated right was clearly established. There can be no doubt that the right to be free from excessive use of force was clearly established at the time of the incident. *See, e.g., Graham,* 490 U.S. at 395 (explaining the standard to be used to determine whether a government official used excessive force). Striking the Plaintiff while he was handcuffed, restrained, and unthreatening was unlawful conduct given the circumstances, and that it was excessive "would [have been] clear to a reasonable officer." *Saucier,* 533 U.S. at 202. Consequently, Lt. McDermott does not have qualified immunity with regard to his alleged striking of the Plaintiff.

### iv. Participation of Other Officials

The Defendants urge the court, in addition, to dismiss on summary judgment any claims against Chief Hickey, Officer Barone, and Sgt. Motolla with regard to this alleged striking. Specifically, the Defendants argue that the Plaintiff fails to allege any participation of these three officials, and that it would therefore be appropriate to dismiss claims against them.

A plaintiff must, at minimum, allege that he suffered an injury by a defendant for his claim against that defendant to survive summary judgment. *Wachtler v. County of Herkimer,* 35 F.3d 77, 82 (2d Cir.1994); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Here, the Plaintiff has not alleged that Chief Hickey, Officer Barone, or Sgt. Motolla participated in Lt. McDermott's alleged use of excessive force. Therefore, the claims against Chief Hickey, Officer Barone, and Sgt. Motolla are dismissed.

### H. False Arrest Claims

The Defendants argue that the court should dismiss the Plaintiff's false arrest claims on the grounds that the Plaintiff was never formally arrested.[7] (Defs. Memo. at 15.) The Plaintiff, however, argues that a person need not be actually arrested to state a valid claim of false arrest. (Pl. Opp. at 18.) Specifically, he argues that he was placed in a position where a reasonable person would not have felt free to leave and that this deprivation of freedom was sufficient to state a false arrest claim. (*Id.*)

A cause of action for false arrest can be brought either as a violation of state tort law or as a violation of § 1983 based on an unreasonable seizure under the Fourth Amendment. *See, e.g., Savino v. City of New York,* 331 F.3d 63, 75 (2d Cir.2003). For neither cause of action is formal arrest a necessity. For the state law tort claim, [8] a plaintiff must show that the defendant intended to confine the plaintiff, the plaintiff was conscious of the confinement, the plaintiff did not consent to the confinement, and the confinement was not otherwise privileged. *Id.* Significantly, "[t]here is no requirement under New York law that an arrest be in any sense formal." *Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991); *see also Hicks,* 508 N.Y.S.2d at 166, 500 N.E.2d 861 (1986) ("Even without a technical formal arrest, a suspect's detention may in fact be the equivalent of an arrest...."); *People v. Chestnut,* 51 N.Y.2d 14, 431 N.Y.S.2d 485, 489, 409 N.E.2d 958 (1980) ( "[W]hen the intrusion involved is of sufficient magnitude, an 'arrest' will be said to occur whether or not the person is eventually transported to the police station and charged with a crime."). To determine whether a person has been arrested, the court considers whether a reasonable man, innocent of any crime, would have thought he was arrested. *People v. Hicks,* 508 N.Y.S.2d at 166, 500 N.E.2d 861 (citing *People v. Yukl,* 25 N.Y.2d 585, 589, 307 N.Y.S.2d 857, 256 N.E.2d 172 (1969)).

**\*11** Similarly, a plaintiff need not show that there was a formal arrest to state a valid § 1983 claim. Arrest is the "quintessential seizure of the person." *Posr,* 944 F.2d at 97 (citing *California v. Hodari D.,* 499 U.S. 544, 551-57 (1980)). However, a person need not be formally arrested to be seized in violation of the Fourth Amendment. *Id.* at 97. Under constitutional standards, a person is seized "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 99 (finding that even without a formal arrest, a plaintiff was sufficiently "arrested" and "seized" for false arrest and § 1983 purposes when an officer "slammed" the plaintiff against a wall); *Green v. City of New York,* No. 01 Civ.1996, 2004 U.S. Dist. LEXIS 5, at \*32-33 (S.D.N.Y. Jan. 5, 2004) ("There is no doubt that Mr. Green's transport to the hospital against his wishes was a 'seizure' within the meaning of the Fourth Amendment.").

In this case, although the Plaintiff was never formally arrested, his wrists were tightly handcuffed behind his back and he was struck in the head and face. (Petway Dep. at 79-80, 83, 112.) Furthermore, the Plaintiff was informed that he would be transported to the hospital against his will, perhaps even tranquilized. (*Id.*) Defendants point out that the Plaintiff was only handcuffed for several minutes, but a seizure may be effected for the purposes of the Fourth Amendment even when an officer "briefly detains an individual and restrains that person's right to walk away." *United States v. Moreno,* 897 F.2d 26, 30 (2d Cir.1990). A reasonable person, in the Plaintiff's situation, could reasonably have believed that he was not free to leave. Thus, the Plaintiff's false arrest claims will not be dismissed merely because the Plaintiff was not formally arrested.

### I. Right to Refuse Medical Treatment

The Plaintiff has argued that he was denied the right to refuse medical treatment. The Defendants contend that this claim should be dismissed because the Plaintiff consented to go to the hospital. (Defs. Memo. at 15.) They argue, in addition, that even if he did not go voluntarily, the claim should be dismissed because the EMS could have transported him to the hospital without his consent. (*Id.* at 15-16.) The Plaintiff responds that his injuries were not so severe as to justify taking him to the hospital without his consent, and that he did not submit voluntarily to hospitalization, but rather was coerced to do so. (Pl. Opp. at 19.) Because the court finds that the EMS could have transported the Plaintiff without his consent, the court need not decide whether the Plaintiff consented to this transportation.

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." The Supreme Court has interpreted this Amendment to mean that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment...." *Cruzan v. Director, Missouri Dep't of Health,* 497 U.S. 261, 278, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). The right to refuse medical treatment "does not rest upon 'a general and abstract right to hasten death, but on well-established, traditional rights to bodily integrity and freedom from unwanted touching," *Blouin v. Spitzer,* 356 F.3d 348, 360 (2d Cir.2004) (citing *Vacco v. Quill,* 521 U.S. 793, 807, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997)). This right is "squarely grounded in the act of consent: Everyone, regardless of physical condition,

is entitled, *if competent,* to refuse unwanted lifesaving medical treatment." *Blouin,* 356 F.3d at 360 (citations and quotation marks omitted) (emphasis in original).

**\*12**  However, the state has an interest in protecting and preserving the lives of its citizens. *Green,* 2004 U.S. Dist. LEXIS 5, at \*34. Therefore, when an officer reasonably concludes that an individual cannot make a competent judgment, or that the official would very likely expose himself to potential liability if he does not transport the individual to a hospital, that officer may force the injured individual to receive medical treatment even against that individual's will. *See Green,* 2004 U.S. Dist. LEXIS 5, at \*36-37; *see also Vazquez v. Marciano,* 169 F.Supp.2d 248, 253 (S.D.N.Y.2001).

In *Green v. City of New York,* for example, a woman called for emergency medical assistance because she believed that her husband could not breathe. *Green,* 2004 U.S. Dist. LEXIS 5, at \*35. At least one of the medical officers, after his arrival on the scene, believed that the husband was dying and that he would have to go to the hospital to survive. *Id.* The husband, who could communicate only through blinking and through a computer, expressed to his wife that he did not wish to go to the hospital, and she communicated this message to the medical officers; however, the technicians transferred him to the hospital in spite of his wishes. *Id.* at \*3, \*15-\*16. The court found that it was reasonable for the emergency medical officials to transport the plaintiff to the hospital against his will, and the court therefore refused to impose liability on the officials for their conduct. Specifically, the court reasoned that "the crisis atmosphere would have caused the officers to conclude that this was not a setting in which [the plaintiff] could make an informed and competent decision regarding his treatment," and that the officers would have exposed themselves to potential liability had they not transported the plaintiff to the hospital given the "extreme danger" of his medical condition. *Id.* at \*36-\*38.

The court in *Vazquez v. Marciano* came to a similar conclusion. In that case, the plaintiff had been in a serious car accident. *Vazquez v. Marciano,* 169 F.Supp.2d 248, 250 (S.D.N.Y.2001). Plaintiff's car hit a tree, causing him to momentarily black out and rendering his passenger unconscious and trapped inside the vehicle. *Id.* at 250, 253. When officers arrived, the plaintiff tried to evade them. *Id.* at 250. Once apprehended, the plaintiff was taken to

the hospital against his express wishes. *Id.* at 250-51. When the plaintiff sued the officer for forcing him to undergo medical treatment, the court determined that the officers were entitled to qualified immunity because the officers had acted in an objectively reasonable manner. *Id.* at 253. Specifically, the court reasoned that the plaintiff could not have made a rational decision because he was inebriated and because of the crisis atmosphere. *See id.* Furthermore, it was reasonable for the officer to transport the plaintiff to the hospital because, given the plaintiff's injuries, the officer would have been exposed to liability had he not transported the plaintiff. *Id.*

**\*13**  In the present case, interpreted in the light most favorable to the Plaintiff, the facts suggest that a conclusion similar to that in *Green* and *Vazquez* is appropriate. A fire "was raging out of control" at the Plaintiff's residence. (Pl. Am. Comp. at 2.) In his escape from the fire, the Plaintiff burned the left side of his face, his left ear, his right hand, and four of his fingers. (*Id.* at 2.) Later, the Plaintiff was struck, allegedly so hard that his nose was broken and there was blood "all over" the Plaintiff's pants and shirt. (Petway Dep. at 83-85.) The Plaintiff then received medical attention from Lt. Miller, an EMS official, who testified that she believed that if the Plaintiff was not treated at a hospital, he could have lost a limb or even his life. (Miller Dep. at 25.) The Plaintiff repeatedly refused to go to the hospital and was repeatedly told that he could and would be taken against his will if it was determined that his life was at risk. (*Id.* at 86-88.) Eventually, he agreed to go to the hospital. (*Id.* at 5.) He ultimately was treated at the hospital's burn unit for over two weeks. (Pl. Dep. at 95.)

In this case, as in the *Green* and *Vazquez* cases, there was an emergency "crisis" situation. Notably, while the plaintiff in *Green* was hospitalized for five days, the Plaintiff here was injured to the extent that he needed over two weeks hospitalization. Similarly, the officers in this case, like those in *Green* and *Vazquez,* could reasonably have believed that they would have exposed themselves to legal liability if they had permitted the Plaintiff to refuse medical treatment. A person's right to refuse medical treatment must be balanced with the state's interest in preserving the lives and safety of its citizens. Imposing liability in such a situation as this would impermissibly discourage medical professionals from performing their life-saving functions. *See Green,* 2004 U.S. Dist. LEXIS 5, at \*36-37 ("The state also has an interest in protecting its employees from liability for decisions such as

the one in this case; imposing liability in this circumstance could cause future decision makers to err on the side of leaving critically ill patients without professional medical assistance.")

It should further be noted that the Plaintiff has failed to provide the court with any case law in support of this Fourteenth Amendment claim. He has provided no case in which a seriously injured person, forced to accept medical treatment under crisis conditions, collected damages arising from the Fourteenth Amendment right to refuse medical treatment. Therefore, given the crisis situation, the Plaintiff's serious injuries, the lack of supporting relevant case law, and the underlying policy considerations, the court finds that the Defendants did not violate the Plaintiff's Fourteenth Amendment right to refuse medical treatment.

Notwithstanding that the Plaintiff's Fourteenth Amendment right was violated, the Defendants are nonetheless immune from liability here. As noted above, the court engages in a two-step analysis when it seeks to determine whether a municipal employee should be protected by qualified immunity against a § 1983 claim. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). In the first step, the court determines whether a constitutional right was violated. *Id.* In the second step, the court determines whether that right was clearly established, considering the particular circumstances of the case. *Id.* Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *see also Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004).

 **\*14** Assuming, *arguendo,* that the Plaintiff's Fourteenth Amendment rights were violated, it cannot be said that the Defendants acted in an unreasonable manner when they forced him to accept medical treatment, especially considering the fact that the Plaintiff was so severely burned that he required over two weeks of hospitalization, that one EMS official believed that his life was at risk, and that the

Plaintiff's decision-making process may have been impaired by the crisis atmosphere. Given these circumstances, Lt. Miller and Sgt. Motolla acted in an objectively reasonable fashion. *See Luna,* 356 F.3d at 490 ("[E]ven assuming a state official violates a plaintiff's constitutional rights, the official is protected nonetheless if he objectively and reasonably believed that he was acting lawfully.") The Plaintiff's right to refuse medical treatment under these conditions was therefore not clearly established. Even if the Defendants did violate his Fourteenth Amendment rights, they are nevertheless protected under the doctrine of qualified immunity.

## IV. Conclusion

For the foregoing reasons, the Defendants' motion for summary judgment is granted in part and denied in part. Defendants' motion for summary judgment is GRANTED with respect to the following: claims against NYPD, FDNY, EMS; claims against Officer Grau; claims against Lt. Miller and the two unidentified firemen; § 1983 claims for verbal abuse; § 1983 claims against the City of New York; claims against Chief Hickey, Officer Barone, and Sgt. Motolla concerning the alleged striking of the Plaintiff by Lt. McDermott; and the Plaintiff's claim of a Fourteenth Amendment violation of the right to refuse medical treatment. The aforementioned claims are dismissed. Defendants' motion for summary judgment is DENIED with respect to the following: claims against Lt. McDermott for excessive use of force and Plaintiff's false arrest claims. In addition, Plaintiff's motion to compel discovery is denied.

The parties are instructed to contact Magistrate Judge Bloom to prepare a pre-trial order.

SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2005 WL 2137805

## Footnotes

1    It should be noted that the EMS merged with the FDNY in 1996. New York City Fire Department, *History and Heritage / EMS,* at *http:// nyc.gov/html/fdny/html/history/ems.shtml; see also Giuliani's Budget Plan: the*

*Overview,* N.Y. TIMES, May 10, 1996, at A1. As part of the FDNY, which is not a suable entity, the EMS remains not suable.

2    It should also be noted that the Defendants, in their motion papers, argue that their failure to save the Plaintiff's dogs did not violate the Plaintiff's constitutional rights. (Defs.Mem.6.) However, the Plaintiff's complaint never alleged that such failure amounted to a constitutional violation, and indeed the Plaintiff himself explained that this was not material to his constitutional claims against the Defendants. (Pl. Opp. at 2.) As these claims were never raised, they are not considered among the claims maintained by the Plaintiff.

3    It should be noted that the Plaintiff incorrectly argues that the Defendant bears the burden of proving Lt. Miller was never served. (Pl. Resp. at 1.) Because the Defendant has validly challenged the service of process, the burden shifts to the Plaintiff to prove that proper service was performed. *Johnson v. Quik Park Columbia Garage Corp.,* No. 93 Civ. 5276, 1995 WL 258153 at *1 n. 2 (S.D.N.Y. May 2, 1995).

4    The Plaintiff does not directly address this argument in his opposition brief, but does contend that his *§ 1983* claims should not be dismissed even in the event that city officers may have qualified immunity. (Pl. Opp. at 21-22.) Additionally, he argues that the action should not be dropped because there are disputed facts which a jury ought to resolve at trial. (*Id.* at 22.)

5    They also argue that the broken nose may not have been caused by Lt. McDermott. Specifically, they conjecture that the Plaintiff may have broken his nose when he fell on the stairs of his building. (Defs. Mem. at 11.) They note, in addition, that the Plaintiff was not treated for a broken nose while at the hospital. (Defs. Mem. at 11-12.) The Plaintiff testified, however, that Lt. McDermott struck his nose so hard that the Plaintiff's nose began to bleed, causing blood to pour "all over" his pants and shirt. (Petway Dep. at 85.) In addition, a hospital report two days after the event indicated that the Plaintiff had "bilateral comminuted nasal bone fractures." (*See* Feb. 1, 2001 New York Presbyterian Hospital Diagnosis at 1.) In light of this testimony and information, the court cannot find that there is no disputed issue of fact as to whether the Plaintiff's nose was broken. In any event, even if the Plaintiff's nose was not broken, Lt. McDermott's alleged striking of the Plaintiff, while the Plaintiff was handcuffed, restrained, and unthreatening, would nevertheless constitute an unreasonable and excessive use of force.

6    Although the Fourth Amendment was primarily directed at restraining unreasonable searches and seizures conducted by the police, the Amendment also imposes restraints upon civil authorities, including firefighters. *New Jersey v. T.L.O.,* 469 U.S. 325, 335, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) ("[T]he [Supreme] Court has long spoken of the Fourth Amendment's strictures as restraints imposed upon 'governmental action'-that is, 'upon the activities of sovereign authority.' Accordingly, we have held the Fourth Amendment applicable to the activities of civil as well as criminal authorities ....") (citations omitted); *see also Michigan v. Clifford,* 464 U.S. 287, 293, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984) (applying Fourth Amendment restraints to firefighters).

7    It is unclear whether the Defendants seek a dismissal of false arrest claims brought under state tort law or of false arrest claims brought under *§ 1983* for a violation of the Plaintiff's Fourth Amendment rights. In any event, dismissal is justified in neither situation.

8    Under the doctrine of supplemental jurisdiction, a federal district court can hear a state tort law false arrest claim. *See e.g., Rodriguez v. Phillips,* 66 F.3d 470, 482 (2d Cir.1995). The court may preside over a pendent state-law claim which shares the same set of facts as a claim over which the court has original jurisdiction. *Lyndonville Sav. Bank & Trust Co. v. Lussier,* 211 F.3d 697, 704-05 (2d Cir.2000) (explaining

that state-law false arrest claim must share with the federal-law claim "a common nucleus of operative fact" for the court to hear the state-law claim by means of supplemental jurisdiction)

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 410095
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Sutcliffe THOMAS, Plaintiff,

v.

John P. KEANE, et al., Defendants.

No. 99 Civ. 4302 DC.
|
April 23, 2001.

**Attorneys and Law Firms**

Sutcliffe Thomas, Clinton Correctional Facility, Dannemora, New York, Plaintiff, pro se.

Eliot L. Spitzer, Attorney General of the State of New York, By: Susan M. Barbour, Assistant Attorney General, New York, New York, for Defendant Crawford.

Fager & Amsler, By: George V. Pappachen, Jr., New York, New York, for Defendant Roth.

Geisler & Gabriele, LLP, By: Lindsey A. Davison, Garden City, New York, for Defendant Buhta.

Wilson, Elser, Moskowitz, Edelman & Dicker LLP, By: Laura B. Jordan, White Plains, New York, for Defendant St. Agnes Hospital.

*MEMORANDUM DECISION*

CHIN, J.

**\*1** In this case, *pro se* plaintiff Sutcliffe Thomas claims that the defendants, Sgt. Melvin Crawford, Kalyani Buhta, M.D., Aaron Roth, M.D., and St. Agnes Hospital ("St.Agnes") are responsible for the injuries plaintiff sustained when he was stabbed by another inmate while incarcerated at Sing Sing Correctional Facility ("Sing Sing"). Specifically, plaintiff alleges that his constitutional rights under the Eighth and Fourteenth Amendments were violated because Crawford failed to protect him from the attack. In addition, plaintiff contends that Roth and Buhta failed to provide adequate medical care while treating him at St. Agnes. Plaintiff brings this action for damages pursuant to ⚐ 42 U.S.C. § 1983.

Defendants move for summary judgment under Fed.R.Civ.P. 56 on the following grounds: plaintiff failed to exhaust administrative remedies; the Court lacks jurisdiction under the Eleventh Amendment; plaintiff fails to state a claim under the Eighth Amendment; qualified immunity protects Crawford; improper service of process; and the statute of limitations. For the reasons set forth below, the motions are granted.

*BACKGROUND*

A. *Facts*

Defendant Crawford is employed as a sergeant at Sing Sing. Crawford was working there on April 13, 1996 and was assigned to Housing Block B ("HBB"). (Crawford Aff. ¶¶ 3, 7). A corrections officer informed Crawford that an inmate had reported an assault and threats of retaliation between Muslim and Dominican inmates in HBB. (Am. Compl. Exs. B & C; Crawford Aff. ¶ 15). Crawford questioned several officers as well as the Muslim Imam, but no one knew of anything to substantiate the rumors. The prison officials did not know which inmate had been beaten or which inmates had committed the assault. (Crawford Aff. ¶ 16).

Later that day, Crawford responded to an emergency alarm in HBB where there was a disturbance among inmates. (Crawford Aff. ¶¶ 27–29). Crawford followed standard procedure by waiting with the other officers outside a locked gate until receiving notice that the area was safe to enter. (Crawford Aff. ¶¶ 32–38). During the altercation, plaintiff, who is Muslim and, at the time was an inmate at Sing Sing, was stabbed by another inmate. (Am.Compl.¶¶ 2, 9).

Plaintiff underwent surgery at St. Agnes for the abdominal stab wound. Defendant Roth performed surgery and defendant Buhta assisted. (Am.Comp.Ex. E). After a prolonged hospital stay during which he complained of abdominal pain, plaintiff was released. Shortly thereafter, plaintiff returned to the emergency room suffering from "severe cramping pain" and underwent a second surgery on May 15, 1996. (Am.Comp.Ex. E).

B. *Procedural History*

Plaintiff brought this action by submitting a complaint to the Court's *Pro Se* Office on April 9, 1999, naming seven individual defendants, Crawford, Buhta, Roth, Corrections Officer Caballero, John P. Keane, Brant L. Kehn, and Thomas

Healey, as well as four John Doe defendants and St. Agnes. Caballero died on October 9, 1999, and no motion was ever made to substitute his estate in the case. On February 23, 2000, plaintiff's claims against defendants Keane, Kehn, and Healey were dismissed pursuant to Fed.R.Civ.P. 4(m) for failure to complete service on these defendants and file proof of service with the Court. The four John Doe defendants have never been identified or served.

**\*2** Plaintiff filed an amended complaint on April 7, 2000.

After the completion of discovery, these motions followed.

*DISCUSSION*

A. *Applicable Law*

1. *Summary Judgment Standard*

Summary judgment will be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see*

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but [to] determine whether there is a genuine issue for trial." *Anderson v.. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). A factual issue is genuine if it can reasonably be resolved in favor of either party. *Id.* at 250. A fact is material if it can affect the outcome of the action based on the governing law. *Id.* at 248.

In evaluating the record, the Court must resolve ambiguities and draw reasonable inferences against the moving party and assess whether there are any factual issues to be tried. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 903 (1990); *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 448 (2d Cir.1999), *cert. denied,* 530 U.S. 1242 (2000).

In a motion for summary judgment, the moving party must first demonstrate the absence of genuine issues of material fact, and then the nonmoving party must set forth facts proving that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 321–22 (1986).

The nonmoving party may not rely on conclusory allegations to create disputed factual issues. *See* *Hussein v. Hotel Employees & Rest. Union, Local 6 ("Hussein v. Local 6"),* 108 F.Supp.2d 360, 365 (S.D.N.Y.2000) (citing *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998)). Rather, the nonmoving party must present "significant probative evidence tending to support the complaint." *First Nat'l Bank of Arizona v. Cities Servs. Co.,* 391 U.S. 253, 290 (1968). *See* *Lujan,* 497 U.S. at 888 ("the object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint ... with conclusory allegations"); *Liberty Lobby,* 477 U.S. at 248 ("[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denial[s] of [his] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.' ' (quoting Fed.R.Civ.P. 56(e))).

To defeat a motion for summary judgment, the nonmoving party must do more than raise "some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586; *see* *Fleurcis v. Short Line Hudson Transit Bus,* No. 99 Civ. 2754, 2000 WL 1863536, at \*4 (S.D.N.Y. Dec. 20, 2000). There is no issue for trial unless there exists sufficient evidence favoring the nonmoving party to support a jury verdict for that party. *Liberty Lobby,* 477 U.S. at 249–50. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted).

**\*3** Where a *pro se* litigant is involved, "the court has an obligation to read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments they suggest." *Hussein v. Local 6,* 108 F.Supp.2d at 365 (internal quotations omitted) (alterations in original). Nonetheless, the same standards for dismissal apply. *Lee v. Artuz,* No. 96 Civ. 8604, 2000 WL 231083, at \*2 (S.D.N.Y. Feb. 29, 2000).

2. *Section 1983*

To state a § 1983 claim, a plaintiff must allege a violation of his constitutional or statutory rights by a person acting under the color of state law. 42 U.S.C. § 1983. To be liable under § 1983, the defendant must have been personally involved in the alleged violation. *See* *Wright*

*v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Tolliver v. Wilson,* No. 99 Civ. 9555, 2000 WL 1154311, at \*5 (Aug. 14, 2000). Personal involvement, in this context, means "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996); *see also Wright,* 21 F.3d at 501; *Tolliver,* 2000 WL 1154311, at \*5. "Liability may not be premised on the respondeat superior or vicarious liability doctrines, ... nor may a defendant be liable merely by his connection to the events through links in the chain of command." *Prince v. Edwards,* No. 99 Civ. 8650, 2000 WL 633382 (S.D.N.Y. May 17, 2000) (internal quotation omitted).

The Eighth Amendment, which applies to states under the Fourteenth Amendment due process clause, guarantees freedom from cruel and unusual punishment. Under the Eighth Amendment, prison officials are required "to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996); *see also Farmer v. Brennan,* 511 U.S. 825, 832 (1994); *Knowles v. New York City Dep't of Corr.,* 904 F.Supp. 217, 220 (S.D.N.Y.1995). "Prison officials have a duty to protect prisoners from violence at the hands of other inmates since being violently assaulted in prison is 'simply not part of the penalty that criminal offenders pay for their offenses against society.' " *Lee,* 2000 WL 231083, at \*4 (quoting *Farmer,* 511 U.S. at 834)). But, "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer,* 511 U.S. at 834.

To challenge conditions of confinement under the Eighth Amendment, a prisoner must show that the prison official or state actor acting with deliberate indifference to the prisoner's safety, subjected the prisoner to a sufficiently serious deprivation. *See Dawes v. Walker,* 239 F.3d 489, 493–94 (2d Cir.2001); *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999); *Crawford v. Artuz,* No. 98 Civ. 0425, 2001 WL 289895, at \*8 (S.D.N.Y. March 22, 2001). This requires a showing of both objective and subjective elements. With respect to the objective element, the alleged deprivation must

be so serious as to be "considered cruel and unusual." *Doyle v. Coombe,* 976 F.Supp. 183, 186 (W.D.N.Y.1996); *see also Farmer,* 511 U.S. at 834 (stating that a "prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities" (internal quotation omitted)). With respect to the subjective element, "the prison official involved must have acted with a 'sufficiently culpable state of mind.' " *McPherson,* 174 F.3d at 280 (quoting *Farmer,* 511 U.S. at 834 (internal quotation omitted)).

**\*4** Failure-to-protect claims are treated as challenges to conditions of confinement. *See Lee,* 2000 WL 231083, at \*3 (citing *Edney v. Karrigan,* 69 F.Supp.2d 540, 544 n. 1 (S.D.N.Y.1999)). Where, as here, plaintiff challenges the condition of confinement, the relevant state of mind is deliberate indifference. *Id.*

The Eighth Amendment also guarantees that doctors, acting under the color of state law, will provide adequate medical care to inmates. *See Estelle v. Gamble,* 429 U.S. 97, 104 (1976). Moreover, a physician, who under contract provides medical assistance to state inmates, acts under the color of state law. *West v. Atkins,* 487 U.S. 42, 54 (1988). To state a cognizable claim of Eighth Amendment violation under § 1983, a prisoner must allege deliberate indifference to his serious medical needs. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991). "[A]llegations of inadvertent failure to provide adequate medical care ... or of a negligent diagnos[is] ... simply fail to establish the requisite culpable state of mind." *Id.* (internal quotation omitted).

## B. *Application*

### 1. *Claims Against Crawford*

Plaintiff alleges that Crawford violated his Eighth Amendment rights by failing to foresee the altercation and failing to prevent plaintiff's injuries. Plaintiff must show that, objectively, the conditions of his incarceration posed a substantial risk of serious harm, and, subjectively, Crawford acted with deliberate indifference. *See Farmer,* 511 U.S. at 834. Here, a reasonable jury could not find that Crawford acted with the state of mind required in an Eighth Amendment violation.

In failure-to-protect cases, "a prison official acts with deliberate indifference and thus 'has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.' " *Lee,* 2000 WL 231083, at *4 (quoting *Hayes,* 84 F.3d at 620). Crawford was informed that an inmate had been assaulted earlier on April 13 and that the violence could continue. (Crawford Aff. ¶ 15). In response, Crawford inquired about these rumors by questioning corrections officers and the Imam. Despite his efforts, Crawford did not learn the identity of the inmate who was beaten or which inmates were involved, and he learned nothing to substantiate the rumors. (Crawford Aff. ¶¶ 18–19, 22–24 & 26). Moreover, prison officials do not respond to all purported threats of disruption. Indeed, "there must be some substantiation of information before any type of precautionary measures are employed ... because inmates have been known to spread rumors about one area in an attempt to divert security" from another. (Crawford Aff. ¶¶ 45–46).

Plaintiff argues that had Crawford made further inquiries with officials and inmates he could have learned more information that would have led him to prevent the altercation. The issue, however, is whether Crawford acted with deliberate indifference. Given that Crawford made several inquiries to correction officers and the Imam, and he did not ignore the rumors of planned violence, a reasonable jury could not find that Crawford acted with deliberate indifference. Indeed, Crawford was not even in the HBB when the incident occurred, and there is nothing concrete in the record to suggest that he should have done more than he did. Accordingly, summary judgment is granted to defendant Crawford and the claims against him are dismissed.

### 2. *Claims Against Roth, Buhta, & St. Agnes*

**\*5** Plaintiff alleges that Roth, Buhta, and St. Agnes are all liable for allegedly failing to provide adequate medical care. Specifically, plaintiff contends that Roth and Buhta injured plaintiff while operating on him at St. Agnes and that they failed to respond to plaintiff's complaints for several weeks after the surgery until a second surgery was finally performed. He also asserts negligence on the part of Roth, Buhta, and

St. Agnes. Plaintiff submits a medical report from his second surgery indicating that he required corrective measures, but he does not offer any evidence to support his claim that his injuries were caused by defendants, let alone caused by defendants' deliberate indifference. (*See* Am. Compl. Ex. E). Plaintiff cannot rely on conclusory allegations alone to defeat a motion for summary judgment. *See* *Lujan,* 497 U.S. at 888; *Liberty Lobby,* 477 U.S. at 249; *D'Amico,* 132 F.3d at 149; *Hussein v. Local 6,* 108 F.Supp.2d at 365.

Plaintiff offers no evidence, and only his conclusory allegations, to support his claim that defendants acted with deliberate indifference. Here, no reasonable jury could find that defendants acted with the requisite culpable state of mind. At best, plaintiff arguably has a medical malpractice claim, but "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106. Because § 1983 does not cover medical malpractice, and federal courts do not have jurisdiction over medical malpractice cases, the claims against Roth, Buhta, and St. Agnes are dismissed. [1]

### *CONCLUSION*

For the foregoing reasons, defendants' motions for summary judgment are granted. The claims against Crawford are dismissed, with prejudice. The claims against Caballero are dismissed pursuant to Fed.R.Civ.P. 25(a)(1). The claims against the four John Does are dismissed, without prejudice. The claims against Roth, Buhta, and St. Agnes are dismissed, with prejudice as to the § 1983 claims and without prejudice as to any common law medical malpractice claims that may be properly brought in state court. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2001 WL 410095

## Footnotes

1    Defendants also move to dismiss for failure to exhaust administrative remedies, qualified immunity, the statute of limitations, and the Eleventh Amendment of the Constitution. The claims brought against all defendants in their official capacities are also dismissed under the Eleventh Amendment. *See* *Kentucky v. Graham,* 473 U.S. 159, 169 (1985); *K & A Radiologic Tech. Servs., Inc.. v. Comm'r of Dep't of Health,* 189 F.3d 273, 278 (2d Cir.1999). I do not reach the remaining arguments.

---

**End of Document**                                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by   U.S. v. Ortiz,   S.D.N.Y.,   May 9, 2013

1998 WL 796452

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Caprice CAMMICK, Sean Cammick, an Infant
under the age of 18 years, by Caprice Cammick, his
Guardian ad Litem, and Danielle Cammick, Plaintiffs,
v.
CITY OF NEW YORK, New York City Police
Department, Police Officer Eugene McHugh (Shield
# 18853), Police Officer Charles Kuhno (Shield
# 14901), Police Officer Paul Pizzuta (Shield #
26262), Detective Carlos Gonzalez (Shield # 1861),
Police Officer John Doe, Police Officer Richard
Roe, and Police Officer Jane Doe, Defendants.

No. 96 Civ. 4374(RPP).
|
Nov. 17, 1998.

**Attorneys and Law Firms**

Donald E. Cameron, New York, NY, for Plaintiffs.

Michael D. Hess, Corporation Counsel, The City of New
York, New York, NY, By: Elisa Baldwin, for Defendants.

OPINION AND ORDER

PATTERSON, J.

**\*1** Defendants move at the close of discovery for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure dismissing the complaint which seeks damages for
violations of 42 U.S.C. § 1983 and state causes of action
for false arrest, abuse of process, malicious prosecution,
assault, intentional infliction of emotional distress and
conversion of plaintiffs' property. Although this action was
commenced on June 13, 1996, Police Officers John Doe,
Richard Roe and Jane Doe have not been served by
plaintiffs. Accordingly, the complaint is dismissed as to those
defendants for lack of service of process. Fed.R.Civ.P. 4(m).

**Background**

The case arises out of the arrest on February 28, 1995, of
Caprice and Danielle Cammick for possession of a loaded
semiautomatic gun following the execution by police officers
of a search warrant of their residence. (Affirmation of Donald
E. Cameron dated May 29, 1998 ("Cameron Affirm."), Ex.
E). Caprice and Danielle are sisters who live together in
apartment 4C at 1809 Seventh Avenue in Manhattan (the
"apartment"). Sean Cammick is Caprice's infant son. Caprice
was 20 years old at the time of the incident, Danielle was
16, and Sean was 4. The police officer defendants had
been issued a search warrant for the premises by Patricia
Williams, Justice, Supreme Court, New York County, and
were authorized by the Court to search the apartment for
"cocaine and crack/cocaine paraphernalia used to process
and distribute cocaine, and firearms." (Declaration of Elisa
Baldwin dated March 20, 1998 ("Baldwin Dec."), Ex. A.)

Pursuant to the search warrant, on February 28, 1995,
defendants McHugh, Kuhno, and Pizzuta and other
unidentified police officers entered the plaintiffs' apartment
and performed a search. The search turned up a bullet-proof
vest, a loaded M–11 9 millimeter firearm, and an imitation
pistol (Cameron Affirm., Ex B (McHugh Dep. at 12–13);
Kuhno Dep. at 20.) Caprice and Danielle were then arrested
for possession of the firearm. (McHugh Dep. at 25–26.) A
police laboratory analysis report on the gun determined that
the gun is an "Operable Machine–Gun as Defined in Section
165.00 Subdivision 1. of the N.Y.S. Penal Law." (Baldwin
Dec., Ex. B.)

None of the plaintiffs' names was listed specifically on the
search warrant. Sean Jenkins, Sean Cammick's father, who
was listed specifically on the warrant, was not present at the
time of the police search, and Caprice Cammick informed
the officers present during the search that Sean Jenkins
did not live there and that it was her apartment. (Caprice
Cammick Dep. at 32.) Danielle Cammick resided with her
sister. (Danielle Cammick Dep. at 8.)

Plaintiffs allege that the defendants "unreasonably and
unjustifiably broke into plaintiffs' apartment and ransacked
it, causing extensive damage to Plaintiffs' apartment and
personal belongings while physically and verbally abusing
Plaintiffs." (Compl.¶ 15.) They allege that the "Defendants
also unjustifiably and unreasonably placed Plaintiffs in fear
of death and/or serious bodily injury in that, to wit, one
of the Defendants drew his gun in the immediate presence
of Plaintiffs Caprice Cammick and Danielle Cammick, who

were in the zone of danger, and pointed it in the direction of Plaintiff Sean Cammick, said conduct also causing Plaintiffs' severe emotion distress." (*Id.* ¶ 16.)

**\*2** Defendants have moved for summary judgment on several grounds. First, Defendants contend that plaintiffs' federal and state claims for false arrest and malicious prosecution should be dismissed because Caprice and Danielle Cammick's arrest for possession of the gun was reasonable and proper under both New York Statute, N.Y. Penal Law § 265.15(1) and state and federal common law. New York Penal Law § 265.15(1) creates a presumption that the presence in any room, dwelling, structure, or vehicle of any machine-gun is evidence of its unlawful possession by all persons occupying the place where the machine-gun is found. The common law provides that a person constructively possesses tangible property when she exercises "dominion and control" over the property by having a sufficient level of control over the area where the contraband is found. *See Torres v. Hanslmaier,* 94 Civ. 4082(MGC), 1995 U.S. Dist. LEXIS 6193 at **\*** 6– **\*** 7 (S.D.N.Y. May 2, 1995) (copy attached to Def. Mem.). Second, defendants argue that plaintiffs' claim that plaintiffs' Fourth and Fourteenth Amendment rights were violated by defendants' search of their apartment during which the police ransacked their apartment and destroyed and damaged their property should be dismissed because the search warrant authorized the search, searches necessarily entail some damage to property, and the plaintiffs' allegations of property damage are conclusory. Third, defendants argue that defendants McHugh, Kuhno, and Pizzuta, the arresting officers, are entitled to summary judgment on plaintiffs' § 1983 claims on grounds of qualified immunity. Fourth, defendants argue that defendant City of New York is entitled to summary judgment because the plaintiffs cannot establish the existence of a municipal policy or practice which caused a constitutional deprivation. Fifth, defendants contend that the complaint should be dismissed against the New York City Police Department because it is not a suable entity. Sixth, defendants argue that all claims against defendant Gonzalez must be dismissed because he was not involved in the search or the arrest of plaintiffs. Seventh, defendants argue that if the Court dismisses the plaintiffs' federal claims, it should not take jurisdiction over the plaintiffs' state law claims. And eighth, defendants contend that if the Court does take jurisdiction over the state law claims, they should still be dismissed because plaintiffs have not stated claims for emotional distress or assault.

*Discussion*

Plaintiffs concede that (1) the *Monell* claim against the City of New York should be dismissed because there is no evidence of a municipal policy or practice causing a constitutional deprivation; (2) all claims against the New York City Police Department should be dismissed because it is not a suable entity; and (3) that all claims against defendant Gonzalez should be dismissed because he was not involved in the incident. (Pl. Mem. at 13, 19–20.) Plaintiffs argue that the remaining claims should not be dismissed.

1. *False Arrest/Malicious Prosecution*

**\*3** With respect to plaintiffs' 42 U.S.C. § 1983 claim and state claims for false arrest and malicious prosecution, summary judgment is granted because the undisputed evidence shows that defendant officers entered and searched plaintiffs' apartment pursuant to a search warrant and had good reason to believed that the gun was in the constructive possession of Danielle and Caprice, the admitted residents of the apartment. They therefore had probable cause for the arrests. [1] Plaintiffs argue correctly that the presumption of N.Y. Penal Law § 2265.15(1), which states "The presence in any room, dwelling, structure, or vehicle of any machine-gun is presumptive evidence of its unlawful possession by all persons occupying the place where such machine-gun if found," is inapplicable because the defendant officers' state of mind at the time of the arrest was that the firearm was only a semi-automatic. (Kuhno Dep. at 20.) Nevertheless, there is also a presumption of the common law that a person is in constructive possession of property when she exercises dominion and control over the area in which the property is found. *Torres, supra;* United States v. Anderson, 881 F.2d 1128, 1141 (D.C.Cir.1989); United States v. Morales, 851 F.Supp. 112, 116 n. 6 (S.D.N.Y.1994), *aff'd* 101 F.3d 107 (2d Cir.1996). Plaintiffs' arguments that the pistol was found in a closet which also contained men's clothing and that the defendants "did not possess knowledge that would allow them to conclude that the weapon belonged to either Caprice or Danielle" (Pl. Mem. at 5) are irrelevant. Caprice and Danielle were arrested for criminal possession, not ownership, of a firearm. (McHugh Dep. at 26.) The gun was still in the plaintiffs' constructive possession because they jointly exercised dominion and control over their apartment. Accordingly, the officers had adequate grounds to arrest the plaintiffs Caprice and Danielle for possession of the firearm. *Torres,* 1995 U.S. Dist. LEXIS 6193, at **\*** 6– **\*** 7.

2. *Assault and Intentional Infliction of Emotional Distress*
Plaintiffs' claims for assault and intentional infliction of emotional distress are also dismissed. Deposition testimony submitted on the motion stated that one of the other individuals in an emergency services unit entered the apartment and conducted a security search prior to the named defendants' entry to conduct the search for narcotics, narcotics paraphernalia and a gun; this other person was the one who pointed a gun at Sean Cammick and Danielle Cammick. (Cameron Affirm., Ex. C (C. Cammick Dep. at 25–26, 28); Kuhno Dep. at 16–17.) Plaintiffs offer no evidence suggesting that the person who committed the assault was defendant Kuhno, defendant McHugh, or defendant Pizzuta. (Compl.¶ 16.)

3. *Plaintiffs Federal Claim for Property Damage*
Plaintiffs' claim here is based on alleged conduct by the defendants in destroying property during the search to such an extent that a jury could conclude that defendants' conduct was unreasonable or intended to inflict emotional distress. Defendants deny they destroyed plaintiffs' property unnecessarily. Defendants rely solely on a case in which summary judgment was granted. *Soichet v. Toracina,* No. 93 Civ. 8858(LAP), 1995 WL 489434, at *6 (S.D.N.Y. Aug. 16, 1995), *aff'd* 111 F.3d 124 (2d Cir.1997). [2] In *Soichet,* the plaintiff claimed that government agents had ransacked her apartment and caused property damage, but because the plaintiff's allegations were insufficient to provide a basis upon which a jury could determine that the officers' conduct had been unreasonable, the defense's motion for summary judgment was granted. The Second Circuit affirmed dismissal

of the claim. Here, in contrast, plaintiffs' allegations are much more detailed and plaintiffs assert they have photographs which show extensive damage. (Neither side has submitted the photographs for the Court's inspection.) While it is reasonable for a search to produce a limited amount of damage, a jury could conclude that the damage sustained here by plaintiffs (*see* Pl. Mem. at 7–10) was unreasonable and unnecessary for the conduct of a search for drugs and guns. Nevertheless, the plaintiffs have not shown that any of the named defendants, as opposed to other officers involved in the security search or the search for narcotics and a gun, were responsible for any of the damage they claim occurred during the search, let alone the unnecessary damage. And in any case, there can be no claim of municipal liability under § 1983 based on respondeat superior liability. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Accordingly, summary judgment is granted as to this claim of violation of federal law.

4. *Conversion*
 **\*4** As the federal claims are dismissed, the Court declines to exercise jurisdiction over plaintiffs' remaining state law claims, including a pendent state law conversion claim. *Dunton v. City of Suffolk,* 729 F.2d 903, 910–11 (2d Cir.1984), *amended by* 784 F.2d 69 (2d Cir.1984).

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 1998 WL 796452

---

## Footnotes

1    Furthermore, Officer Kuhno had received information that Caprice and Danielle, as well as Jenkins, had been engaged in narcotic drug activities in the apartment. (Cameron Affirm., Ex. B (Kuhno Dep. at 7).) Those engaged in narcotic drug activities are known often to utilize guns for protection of the drugs.

2    Defendants actually rely on the unpublished decision of the Second Circuit affirming the District Court, *See Soichet v. Toracina,* # 95–2771, 1997 U.S.App. LEXIS 7171 (2d Cir. Apr. 15, 1997) (copy attached to Def. Mem.). Second Circuit Rule 0.23 expressly prohibits the citation to summary orders as precedential authority.

**End of Document**                                © 2023 Thomson Reuters. No claim to original U.S. Government Works.

1998 WL 713809
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jerome WALDO, Plaintiff,

v.

Glenn S. GOORD, Acting Commissioner of New
York State Department of Correctional Services;
Peter J. Lacy, Superintendent at Bare Hill Corr.
Facility; Wendell Babbie, Acting Superintendent
at Altona Corr. Facility; and John Doe, Corrections
Officer at Bare Hill Corr. Facility, Defendants.

No. 97–CV–1385 LEK DRH.
|
Oct. 1, 1998.

**Attorneys and Law Firms**

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst. Attorney
General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a Report–
Recommendation filed on August 21, 1998 by the Honorable
David R. Homer, Magistrate Judge, pursuant to 28 U.S.C.
§ 636(b) and L.R. 72.3(c) of the Northern District of New
York.

No objections to the Report–Recommendation have been
raised. Furthermore, after examining the record, the
Court has determined that the Report–Recommendation is
not clearly erroneous. *See* Fed.R.Civ.P. 72(b), Advisory
Committee Notes. Accordingly, the Court adopts the Report–
Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report–Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without prejudice
as to the unserved John Doe defendant pursuant to
Fed.R.Civ.P. 4(m), and the action is therefore dismissed in its
entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.

HOMER, Magistrate J.

REPORT–RECOMMENDATION AND ORDER [1]

The plaintiff, an inmate in the New York Department
of Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges
that while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and Fourteenth
Amendments. [2] In particular, plaintiff alleges that prison
officials maintained overcrowded facilities resulting in
physical and emotional injury to the plaintiff and failed
to provide adequate medical treatment for his injuries and
drug problem. Plaintiff seeks declaratory relief and monetary
damages. Presently pending is defendants' motion to dismiss
pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the
reasons which follow, it is recommended that the motion be
granted in its entirety.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while
he and two other inmates were playing cards, an argument
ensued, and one of the two assaulted him. Compl., ¶ 17.
Plaintiff received medical treatment for facial injuries at the
prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18–
19. On September 11, 1997, plaintiff was transferred to Altona
and went to Plattsburgh Hospital for x-rays several days later.
*Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10–11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21–22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27–28.

## II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

## III. Discussion

### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v.*

*Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl., ¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347–48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed

for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and* *Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with* *Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21–22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See* *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See* *Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610–11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760–61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See* *Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff

from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96–CV–656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97–CIV–0387, 1998 WL 338097, at *3–4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the

blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

## IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

## V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report–Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 1998 WL 713809

## Footnotes

1       This matter was referred to the undersigned pursuant to 🚩 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2       The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona
        are made against Goord and Babbie.

---

**End of Document**                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Goldstick v. The Hartford, Inc., Not Reported in Fed. Supp. (2002)

Case 9:21-cv-00814-GTS-ML    Document 110    Filed 11/13/23    Page 72 of 73

2002 WL 1906029
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Diane F. GOLDSTICK, Plaintiff,

v.

THE HARTFORD, INC., et ano., Defendants.

No. 00 Civ. 8577(LAK)
|
Aug. 19, 2002.

**Synopsis**
Defendants moved to strike plaintiff's Rule 56.1 Statement, submitted in opposition to defendants' motion for summary judgment dismissing the complaint. The District Court, Kaplan, J., held that statement submitted in opposition to defendants' motion for summary judgment failed to comply with local rule by adding argumentative and often lengthy narrative.

Motion granted in part.

West Headnotes (1)

**[1]**   **Summary Judgment** 🔑 Form and requisites

Plaintiff's statement submitted in opposition to defendants' motion for summary judgment failed to comply with local rule by adding argumentative and often lengthy narrative, the object of which was to "spin" the impact of the admissions plaintiff had been compelled to make; additionally, statement was 41 pages long, a manifest evasion of the page limitation. Local Civ. R. 56.1.

59 Cases that cite this headnote

**ORDER**

KAPLAN, J.

**\*1** Defendants move to strike plaintiff's Rule 56.1 Statement, submitted in opposition to defendants' motion for summary judgment dismissing the complaint, on the ground that it fails to comply with Local Civ. R. 56.1 in that it goes beyond admitting or denying that the propositions of fact set forth in defendants' Rule 56.1 Statement in fact are undisputed and contains a great deal of extraneous, argumentative material, much allegedly based on inadmissible evidence.

"A proper 56.1 statement submitted by a non-movant should consist of a paragraph-by-paragraph response to the movant's 56.1 statement, much like an answer to a complaint. If the non-movant asserts that a fact claimed by the movant to be undisputed is actually in dispute, the non-movant *must* cite evidence on the record to support its contention. It is permissible for the non-movant to provide a separate statement, apart from this paragraph-by-paragraph response, in which it lists other facts it claims to be in dispute. However, this separate statement is *not* a substitute for the paragraph-by-paragraph response. The non-movant, particularly if represented by counsel, should not leave it to the Court to cull from this separate statement the pieces of evidence which would support the contentions of the non-movant asserted in its paragraph-by-paragraph response without citation.

*"Rule 56.1 statements are not argument.* They should contain factual assertions, with citation to the record. They should not contain conclusions, and they should be neither the source nor the result of 'cut-and-paste' efforts with the memorandum of law. A rule 56.1 statement that contains the same turns of phrase, if not the identical whole paragraphs, as the memorandum of law is improper." *Rodriguez v. Schneider,* No. 95 Civ. 4083(RPP,) 1999 WL 459813, \*1 n. 3 (S.D.N.Y. June 29, 1999).

The plaintiff's Rule 56.1 Statement here does not comply with the rule. While in most cases it does admit or deny defendants' descriptions of the allegedly uncontested facts on a paragraph-by-paragraph basis, it adds argumentative and often lengthy narrative in almost every case the object of which is to "spin" the impact of the admissions plaintiff has been compelled to make. In consequence, the response to the 84 number assertions set forth in defendants' Rule 56.1 Statement is 41 pages long and, whether so intended or not, a manifest evasion of the page limitation on plaintiff's memorandum in opposition to the motion for summary judgment.

Accordingly, defendants' motion is granted to the extent that so much of plaintiff's responses as consists of anything more than (a) the admission or denial of the assertions set forth in defendants' Rule 56.1 Statement and the citations to the record, and (b) the section headed "additional facts" is stricken. It is denied in all other respects.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2002 WL 1906029

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.